**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

FILED BY_____ *AP* _____D.C

**Nov 25, 2019**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 25, 2019

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  16-17609-EE  ; 18-10142 -EE
Case Style: USA v. Daniel Ochoa
District Court Docket No: 1:14-cr-20674-JLK-1

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**

_____

No. 16-17609

_____

D.C. Docket No. 1:14-cr-20674-JLK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL OCHOA,

Defendant-Appellant.

_____

No. 18-10142

_____

D.C. Docket No.  1:17-cr-20595-DMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL OCHOA,

Defendant-Appellant.

_____

Appeals from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the
judgment of this Court.

Entered: October 25, 2019
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17609

_____

D.C. Docket No. 1:14-cr-20674-JLK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL OCHOA,

Defendant-Appellant.

_____

No. 18-10142

_____

D.C. Docket No.  1:17-cr-20595-DMM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANIEL OCHOA,

Defendant-Appellant.

———————————————

Appeals from the United States District Court
for the Southern District of Florida

———————————————

(October 25, 2019)

Before ROSENBAUM, GRANT and HULL, Circuit Judges.

HULL, Circuit Judge:

Following two jury trials, Daniel Ochoa appeals his convictions and

sentences for Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2,

knowingly carrying a firearm during and in relation to a crime of violence, in

violation of 18 U.S.C. § 924(c)(1)(A), and knowingly possessing a firearm and

ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

On appeal, Ochoa argues that the district court erred in: (1) limiting his

cross-examination of FBI Task Force Officer Gerard Starkey; (2) denying his

motion to suppress pre- and post-Miranda[1] statements; (3) dismissing Count Three

of the original indictment without prejudice; and (4) denying his motions for

judgment of acquittal in both trials.  Ochoa also contends that the cumulative error

doctrine requires that his convictions be vacated and that the district court

procedurally erred in calculating his advisory guidelines range during both of his

———————————————

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

2

sentencing proceedings.  After review, and with the benefit of oral argument, we affirm Ochoa's convictions and sentences.

## I. FACTUAL BACKGROUND

We begin by describing the underlying armed robbery offense that gave rise to the charges against Ochoa, then move on to his arrest and subsequent questioning by law enforcement.  Our description is based on the evidence presented at trial, as well as testimony and evidence presented during a pre-trial suppression hearing.

### A. The Robbery

On August 15, 2014, an armored Brink's truck was scheduled to deliver $30,000 to Check Cashing USA in Miami.  The truck was manned by two crew members, that is, a driver and a "messenger."  The messenger was "responsible for the contents of the truck," and was tasked with "get[ting] off the truck and then go[ing] into stops" to "make a pickup and/or delivery."  Around 9:00 a.m. that day, in broad daylight, when the messenger, 72-year-old Andres Perez, exited the truck to deliver the $30,000 to Check Cashing USA, he was confronted by a man who pointed a .40 caliber handgun[2] at him and said, "This is a holdup."  The man shot Perez in the leg, took the bag of money, and then ran away.

---

[2]The specific handgun used in the robbery was never recovered.  Law enforcement was able to ascertain the caliber of the weapon from the cartridge casing recovered from the scene.

## B. The Arrest

Thereafter, investigators developed a lead and began to focus on Ochoa as the perpetrator of the robbery.  Once the investigators identified Ochoa as a suspect, Officer Starkey put together a photo lineup including Ochoa's driver's license photo.  Officer Starkey then showed the photo lineup to the victim (Perez) and two other witnesses to the robbery who were previously interviewed by investigators.  All three witnesses identified Ochoa as the perpetrator of the robbery.  These identifications occurred approximately two weeks after the robbery.

Officer Starkey obtained an arrest warrant for Ochoa.  A SWAT team was dispatched to arrest Ochoa at his residence.  Upon arriving at Ochoa's residence around 6:00 a.m., the SWAT team leader, FBI Special Agent Geoffrey Swinerton, ordered everyone out of the residence.  Five people—three males, including Ochoa, and two females—exited the residence.  Agent Swinerton spoke to the three males, one of whom was later identified as Ochoa's 15-year-old brother Angel.  Agent Swinerton asked them if there were other individuals in the residence and if there was anything in the residence that could potentially harm the SWAT team members who might enter the residence to search it.  In particular, he asked them about "[b]ombs, booby traps, weapons," and anything else that could be "harmful."

4

The residents confirmed that no one else was in the residence and initially claimed there was nothing dangerous in the residence.  Agent Swinerton then "pressed the question again," in part because he thought, based on Ochoa's facial expression, there might be something in the residence he would want to know about before sending the members of the team in.  In "press[ing] the question," Agent Swinerton said something to the effect of, "Listen, you know, we're going to end up finding the stuff, but I don't want anybody to get hurt.  You have to let me know if there's anything that could hurt my guys before we go in."  At that point, Ochoa indicated there was a handgun in a drawer in one of the bedrooms.

Agent Swinerton then gave the SWAT team permission to enter the residence and conduct a safety sweep to confirm that there were no other occupants.  The SWAT team, however, did not search for, or retrieve, a handgun.

## C. Ochoa's Interview

Following his arrest, Ochoa was transported to the FBI field office in Miami, where Officer Starkey and another FBI special agent interviewed him.  The interview was video and audio recorded.  Before reading Ochoa his Miranda rights, Officer Starkey asked if Ochoa needed to use the restroom or wanted anything to eat or drink.  Officer Starkey then asked a series of biographical questions as part of the booking process, and to confirm that Ochoa could speak English and was capable of making a reasonable decision concerning his rights.  Officer Starkey

5

then provided Ochoa with an "Advice of Rights" form, which included a recitation of Ochoa's <u>Miranda</u> rights.  Officer Starkey reviewed each statement on the form with Ochoa, and Ochoa answered "Yes" when asked whether he understood each right.

When Officer Starkey reached the final portion of the form, Ochoa expressed some confusion.  The final portion of the form was headed "WAIVER OF RIGHTS" and stated as follows: "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."

After Officer Starkey read this provision, Ochoa repeatedly asked Officer Starkey to "hold on," at which point Officer Starkey read the provision again.  At that point, Ochoa stated he did not "really agree with that one," and Officer Starkey responded that he was not "asking if you agree with it."  Ochoa then stated, "You're asking me at this time [if] I'm willing to answer questions without a lawyer.  I don't agree with that."  Ochoa then expressed concern that if he said yes, that meant he was "willing to cooperate."  Officer Starkey then attempted to further explain the Waiver of Rights provision as follows:

STARKEY: Can I speak for one minute?

OCHOA:    Okay.

STARKEY: Okay.  What it means, and it just lays out your right.  You have  the  right  to  have  an  attorney  here,  to  be  with  you  during

6

questioning.  If that's your decision, then we're not going to talk about the case.  If you decide yes, I want to talk to you, then you can do that. You can also say yes, at this time, I'm willing to talk to you, later I may change my mind.

OCHOA:   Okay, yes, I understand, yes.

STARKEY: Okay.  So, is that yes, you'll speak without an attorney?

OCHOA:   Yes.

Ochoa then signed the Advice of Rights form and agreed to continue the interview.

The form shows Ochoa's initials beside each individual right and his signature at

the bottom.

Notably, Ochoa did not, during the course of the interview, confess to any of

the charged offenses.  He did, however, again discuss the presence of a firearm in

the residence.  Specifically, Ochoa acknowledged that he had told the "SWAT

people that came in the house" that "[he] had a firearm in [his] room," but he noted

that he never said the firearm was his.  When Officer Starkey asked if there were

any firearms in the house, Ochoa again stated that there was a gun "in a drawer" in

"the last [room] to the right," though he claimed he could not recall its type or

color.  Upon further questioning, Ochoa appeared to confirm that he was referring

to "the room that [he] occup[ies]," agreeing with Officer Starkey's statement that

"in your room there should only be one gun."  He stated later in the interview,

however, that he had acknowledged only "somewhat" that he "knew that the gun

was in that room in the . . . drawer."

7

## D. The Search of the Residence

While Officer Starkey interviewed Ochoa at the field office, other agents remained at Ochoa's residence to secure the area until a search warrant could be obtained.  The search warrant application referenced Ochoa's pre- and post-Miranda statements concerning the presence of a gun in the residence.  During this time, some other occupants of the residence, including Ochoa's younger brother Angel, remained near the house.

After obtaining the warrant, agents searched the residence, discovering (1) $12,900 in cash—consisting entirely of $100 bills—wrapped in a bag hidden in the freezer; (2) large amounts of newly purchased merchandise with the tags still attached, along with receipts that documented purchases made after the date of the robbery; (3) firearm accessories, specifically a holster, a large capacity magazine with .45-caliber ammunition inside of it, and a box containing  four rounds of .45-caliber Hornady brand ammunition; (4) a passport photo and travel documents indicating Ochoa planned to fly to Nicaragua and that he purchased his plane ticket after the robbery; (5) a Florida driver's license bearing Ochoa's name and photograph; and (6) several cell phones, along with a receipt confirming Ochoa had purchased one of the phones three days before the robbery.  With the exception of the bag of cash in the freezer and some of the merchandise, all of these items

were recovered from what appeared to be Ochoa's bedroom, and the firearm accessories were recovered from a drawer in that bedroom.

The search team also recovered a black Heckler & Koch gun case (containing a handgun and three loaded magazines) and a stray bullet from the yard. While waiting for the warrant, the agents assigned to secure the area allowed one of the residents—Ochoa's brother, Angel—to go to the side yard and use the restroom out of the agents' line of sight. When Angel took an unusually long time, one of the agents, Special Agent Matthew Carpenter, walked around the residence to find him. Agent Carpenter observed Angel coming back from the far side of the residence, and when Agent Carpenter went to examine the area, he discovered a .45-caliber bullet that did not appear to have been "outside for any length of time," and a black gun case leaning up against the residence. Agent Carpenter also checked the back door and found that it was unlocked. Upon inspecting the case, agents discovered it contained a .45-caliber handgun and three loaded magazines.[3]

---

[3]In the district court, Ochoa also challenged the admissibility of these items, arguing they were the fruit of an unlawful second security sweep conducted by the agents who were securing the property. However, on appeal, Ochoa does not argue that this evidence should have been suppressed, at least not on the ground that the agent was acting improperly when he initially observed the bullet and gun case outside the residence. Rather, Ochoa focuses solely on his verbal statements made to the SWAT team and to Officer Starkey during his interview concerning the alleged presence of a gun inside the residence and any evidence subsequently obtained as a result of those statements.

## II. PRE-TRIAL PROCEEDINGS

A grand jury returned a superseding indictment charging Ochoa with Hobbs Act robbery (Count One), knowingly carrying a firearm during and in relation to, and knowingly possessing that firearm in furtherance of, the crime of violence charged in Count One (Count Two), and knowingly possessing a firearm and ammunition while he was a convicted felon (Count Three).

The district court granted Ochoa's unopposed motion to sever Count Three from Counts One and Two.

### A. Ochoa's Motions to Suppress

Prior to trial, Ochoa filed two motions to suppress. First, he sought to suppress any testimony or evidence concerning the three witnesses' identifications of him based on the photo lineups. A magistrate judge recommended denying the motion to suppress, and when Ochoa did not file any objections to the magistrate judge's report and recommendation, the district court denied the motion.[4]

Next, Ochoa moved to suppress the statements he made to the SWAT team leader at the residence immediately following his arrest, as well as the statements he made to Officer Starkey during his interview at the FBI field office. He argued that his statements to the SWAT team leader about the gun in the residence were the result of questioning that occurred after his arrest but before he was informed

---

[4]On appeal, Ochoa does not challenge the district court's denial of this motion.

of his <u>Miranda</u> rights, and there was no applicable exception to <u>Miranda</u>.  As to the statements he made during the interview at the FBI field office, Ochoa argued he had clearly communicated that he did not wish to speak with investigators without a lawyer present, but the questioning continued.

A magistrate judge conducted an evidentiary hearing, during which Agent Swinerton, Officer Starkey, and Agent Carpenter (who first discovered the stray bullet and black gun case outside the residence) testified.  Agent Swinerton and Officer Starkey described their respective interactions with Ochoa as detailed above, and the magistrate judge reviewed the video of Ochoa's interview.

At the conclusion of the testimony from Agent Swinerton and Officer Starkey, the magistrate judge stated that, even excising the pre- and post-<u>Miranda</u> statements from the warrant application, there was "ample probable cause to have issued the warrant" to search the residence.  As a result, any evidence seized pursuant to the valid search warrant was covered by the independent source doctrine, and the only remaining issue was the admissibility of the statements themselves, which the magistrate judge addressed in a written report and recommendation ("R&R").

In that R&R, the magistrate judge recommended that the district court deny Ochoa's motion to suppress his statements.  First, the magistrate judge found that Ochoa's pre-<u>Miranda</u> statements to Agent Swinerton made at the scene of his

11

arrest to Agent Swinerton were covered by the public safety exception and thus were not subject to suppression, notwithstanding the absence of <u>Miranda</u> warnings. Second, the magistrate judge found Ochoa's interview statements to Officer Swinerton at the FBI field office similarly were not subject to suppression. Because Ochoa failed to unambiguously and unequivocally invoke his Fifth and Sixth Amendment rights by clearly requesting counsel, the statements were not taken in violation of <u>Miranda</u>.

Over Ochoa's objections, the district court adopted the R&R and denied Ochoa's motion to suppress.

## B. The Government's Motion <u>in Limine</u>

Anticipating that it would call Officer Starkey as a witness at Ochoa's trial, the government moved <u>in limine</u> to prevent Ochoa from cross-examining Officer Starkey about a series of events that occurred in 2003 to 2004, when he was a detective with the Miami-Dade Police Department ("MDPD").  In particular, the government sought to preclude Ochoa from asking about two instances of computer misuse involving Officer Starkey that the MDPD discovered in early 2004.

In the first instance, Officer Starkey used MDPD computers from May 2003 through January 2004 to send inappropriate, politically motivated emails to his wife's political opponent in an election.  While Officer Starkey may not have

initially admitted to any wrongdoing, it is undisputed that he later did so in a written memorandum to his supervisor and in statements to Internal Affairs investigators. In the second instance, Officer Starkey used his work computer to access and download sexually explicit images, and subsequently installed and attempted to use an unauthorized program to delete those images. The unauthorized software was downloaded in April 2003. As a result of these actions, the MDPD sustained two allegations for departmental misconduct or improper procedure, and Officer Starkey was suspended for 10 days without pay. No criminal charges were filed against Officer Starkey.

At trial, the district court ultimately granted the government's motion after hearing argument from the parties. The district court also entered a written ruling. The district court concluded evidence of Officer Starkey's disciplinary history was not admissible under Federal Rule of Evidence 608(b), as it was "if at all, only marginally probative of [his] character for truthfulness." The district court further concluded that, in any case, the evidence should be excluded pursuant to Federal Rule of Evidence 403 because its probative value was "considerably outweighed by the danger of confusion to, or misleading of, the jury."

## III.  THE FIRST TRIAL

On September 19, 2016, the case proceeded to trial on Counts One and Two, which lasted four days.  As Ochoa challenges his convictions based on the sufficiency of the evidence, we will review more of the evidence presented at trial.

### A. The Government's Evidence

During the trial, the government presented testimony from 12 witnesses. The government first called two Brink's employees, including the messenger, Perez, who was shot during the robbery.[5]  The first employee, Bruce Woerner, was the director of security for Brink's and testified that $30,000 in $100 bills was to be delivered to Check Cashing USA on the day of the robbery.  Woerner further stated the bag of money that was stolen contained a GPS tracking device, which was briefly activated following the robbery, before it stopped transmitting a signal.

The government later presented testimony from Robert Stevens, a bureau chief for the GPS tracking company that makes and sells the tracking device Brink's places in its money bags.  Stevens testified that the GPS tracker in question showed that the person in possession of the stolen money bag fled east to reach the

---

[5]The government also showed the jury video footage from the Brink's truck.  One of the cameras on the truck captured footage of the robber running up to the truck.  The robber then disappears from view.  A gunshot can be heard, and then the robber is seen running away from the scene holding a bag.  However, due to the quality of the footage and the fact that the robber's face is in shadow, all that can be ascertained from the video is the general build of the robber and that he is wearing a hat.

airport expressway, which he then took westward.  At that point, the device stopped transmitting, indicating it had been discovered and destroyed.

The second Brink's employee to testify was Perez, the messenger from whom the robber took the bag of money, and the person the robber shot.  Perez recounted his memory of the robbery, as detailed above.  When asked if he was able "to get a look" at the robber, Perez stated he "saw his face and the pistol." Perez further testified that he was shown a photo lineup by the FBI on September 2, 2014, and he identified a photograph of the person who held him up.  Perez did not have any recollection of providing law enforcement with a physical description of the perpetrator prior to the day he reviewed the photo lineup.  On cross-examination, Perez acknowledged that, during the robbery, he saw the robber for only four seconds, though Perez maintained he "saw his face" and recalled the robber had a "slight build."

The government then called the other two eyewitnesses who had identified Ochoa in separate photo lineups.  The first eyewitness, Jonathan Montenegro, testified he was with a friend—Deybis Bermudez, the second eyewitness—at a check cashing store when he witnessed the August 15 robbery of the Brink's truck. At the time the robbery occurred, Montenegro was inside the check cashing store, "walking up and down" in front of the window.  Montenegro saw the robber's face while the robber was confronting Perez and as he ran by the window.   Montenegro

was able to describe the robber's face, height, clothing, and skin color at the time of the trial.

The second eyewitness, Deybis Bermudez, confirmed that he was at the check cashing store with Montenegro on August 15 and was able to observe the robbery. Bermudez heard someone screaming, "Give me the bag," and turned around in time to see a man with a gun "fighting with security." Although Bermudez was not able to see the robber's face very well during the confrontation, he saw the robber's profile as he ran away, and was able to describe the robber to police as "[t]hin, with a beard, close-cut beard, short hair, like my shade of skin[,] . . . [a]nd about my height."

Both eyewitnesses also testified about their subsequent identifications of Ochoa from separate photo lineups. Montenegro and Bermudez were together when they were approached by Officer Starkey. The two were separated, and each identified who he believed to be the perpetrator of the robbery.

Montenegro testified that, when he viewed the photo lineup, he was able to quickly narrow it down to two photographs, which he then asked to "take a closer look" at. Once he made an identification, he told Officer Starkey he was sure, and he recalled at trial that he "was completely sure" about his identification at the time. As for Bermudez, he again acknowledged that he was not able to see the

16

robber's face very well, but he picked the picture that he thought looked most like the man he had seen, based primarily on the shade of his skin.[6]

The government then presented the testimony of FBI Special Agent James Kaelin, who participated in the execution of the search warrant at Ochoa's residence and photographed the evidence seized.  The residence had three bedrooms and three bathrooms, but most of the evidence Agent Kaelin photographed came from what Agent Kaelin identified as Ochoa's bedroom. Agent Kaelin drew the conclusion because several of Ochoa's personal items— including his driver's license, cell phones, and travel documents—were recovered from that bedroom.

Agent Kaelin recounted the evidence discovered in the bedroom, including, as we detailed above, Ochoa's driver's license, cell phones, receipts for purchases made after the date of the robbery, travel documents, and merchandise (such as clothing, shoes, and hats) that appeared to be newly purchased.  Notably, one of the receipts confirmed that Ochoa had purchased a cell phone—one associated with the number (305) 986-5014—three days before the robbery.  Agent Kaelin also testified as to the $12,900 in $100 bills that was found in the freezer.

---

[6]None of the three witnesses actually made an in-court identification of Ochoa.  Rather, each witness simply testified that he had chosen a photo from a lineup, and each witness was able to identify the photo he chose because he had signed or initialed the photo at the time of the identification.

On cross-examination, Agent Kaelin acknowledged there were bags of what appeared to be newly purchased clothing in the common areas of the residence, along with displays for jewelry and sunglasses, and boxes of cologne and perfume. Based on the amount of merchandise throughout the residence, Agent Kaelin conceded it looked like someone might have been running a "home business" selling the merchandise. Agent Kaelin further acknowledged that several other people apparently lived in the residence with Ochoa.

Officer Starkey testified next. As the lead investigator into the Brink's robbery, Officer Starkey described the investigative steps he took to identify Ochoa as the robber, including, as we detailed above, the development of a lead that pointed to Ochoa and the subsequent identifications via photo lineup by the victim and two witnesses. As to the identifications, Officer Starkey confirmed that the victim and both witnesses identified a photograph of Ochoa as the robber. Officer Starkey also testified regarding the process by which he compiled the photo lineups and presented them to the witnesses.

Officer Starkey offered further testimony concerning these processes on cross-examination, during which defense counsel questioned him about why and how he chose the particular photo of Ochoa that appeared in the lineup and whether he pressured any of the witnesses into making a selection. Of note, Officer Starkey denied that any of the three witnesses had indicated to him that

they were unable to choose between two photos, which he stated would have constituted a "non-identification."

Officer Starkey also offered testimony concerning the interview he conducted with Ochoa at the FBI field office, and the government submitted into evidence several clips from the interview, which were then played for the jury. Of note, Ochoa confirmed that he had purchased a plane ticket to Nicaragua, though he claimed that he was going to visit his grandmother and that his aunt gave him the money to purchase the ticket. Ochoa also told Officer Starkey during the interview that law enforcement should "put on" Ochoa anything recovered from the house that was "criminal" or "not supposed to be there." However, at the end of the interview, he asserted that he "didn't commit [any] crime" and could not cooperate with law enforcement because he did not "know anything."

Officer Starkey further testified that he participated in the execution of the search warrant at Ochoa's residence and discovered the money in the freezer. On cross-examination, Officer Starkey acknowledged that he had not discovered any direct link indicating that the currency found in the freezer was the particular currency taken from the Brink's truck.

The final set of witnesses the government called all testified concerning evidence retrieved from one of the cell phones that was seized from Ochoa's bedroom. The government called Special Agent Jeffrey Etter, a computer forensic

examiner with the FBI, Marilyn Dilly, a supervisor in subpoena compliance with Sprint, and Special Agent David Magnuson, a member of the FBI's cellular analysis survey team.  Agent Etter established that one of the phones taken from Ochoa's bedroom was likely the same phone Ochoa had purchased three days before the robbery, as it was associated with the same number that appeared on the receipt the search team recovered.

Based on the records for that phone provided by Sprint, Agent Magnuson testified concerning which cell towers the phone connected to on the date and time of the robbery and immediately thereafter.  This cell-tower data, when compared with the GPS tracking for the stolen money bag, indicated that the phone's likely position was consistent with the GPS tracker's location immediately following the robbery and immediately before the GPS tracker was deactivated.

At the close of the government's case, Ochoa moved under Rule 29 of the Federal Rules of Criminal Procedure for a judgment of acquittal, arguing primarily that the government had failed to prove it was actually Ochoa who committed the robbery.  The district court denied the motion, and Ochoa rested without putting on any evidence.

## B. The Verdict and Sentence

After deliberating, the jury found Ochoa guilty on both counts.  The presentence investigation report ("PSR") initially calculated Ochoa's total offense

level of 27, based on the following: (1) a base offense level of 20, pursuant to

U.S.S.G. § 2B3.1(a); (2) a two-level increase because the property of a financial

institution was taken, pursuant to U.S.S.G. § 2B3.1(b)(1); (3) a four-level increase

because a victim sustained serious bodily injury, pursuant to U.S.S.G.

§ 2B1.3(b)(3)(B); and (4) a one-level increase because the loss amount was more

than $20,000 but less than $95,000, pursuant to U.S.S.G. § 2B3.1(b)(7)(B).

The PSR also concluded that Ochoa was subject to an enhanced sentence as

a career offender, pursuant to U.S.S.G. § 4B1.1, because: (1) he was at least 18

years old when he committed the offenses of conviction; (2) one of his offenses of

conviction was a felony "crime of violence"; and (3) he was previously convicted

of at least two felony "crimes of violence." The PSR identified two prior Florida

convictions as qualifying "crimes of violence" under § 4B1.1: (1) a 2007

conviction for armed robbery; and (2) a 2009 conviction for second-degree murder.

Based on his career-offender designation, Ochoa's base offense level was

increased to 32.

Ochoa's total offense level of 32 and criminal history category of VI—

which was also based on his career-offender status under § 4B1.1(b)—resulted in

an advisory guidelines range of 210 to 262 months' imprisonment. However,

because Ochoa was a career offender with a count of conviction other than his

§ 924(c) conviction—his conviction for Hobbs Act robbery—his guideline range

became 360 months' to life imprisonment, pursuant to U.S.S.G. §§ 4B1.1(c)(2) and

(3).

Prior to sentencing, Ochoa did not object to the PSR.  At sentencing, he

objected to, inter alia, paragraphs 36 and 37 of the PSR—which detailed his

Florida convictions for armed robbery and second-degree murder, respectively.  He

did not, however, specifically argue that either of his prior Florida convictions did

not categorically qualify as a violent felony under U.S.S.G. § 4B1.2(a).

Following the sentencing hearing, the district court sentenced Ochoa to a

total sentence of 360 months' imprisonment, consisting of a 240-month sentence as

to Count One, followed by a consecutive 120-month sentence as to Count Two.

Ochoa appealed, generating case no. 16-17609 in this Court.

### IV. MISTRIAL, DISMISSAL & REINDICTMENT ON COUNT THREE

On September 26 and 27 of 2016, a second jury trial was held, this time on

Count Three of the indictment, which charged Ochoa with being a felon in

possession of a firearm and ammunition.  When the trial resulted in a hung jury,

the district court declared a mistrial.

On September 28, 2016, the district court issued an order initially setting

retrial for January 23, 2017.  The district court's order specifically noted that "THE

SCHEDULED TRIAL DATE . . . MAY BE SET BEYOND THE TIME LIMITS

OF THE SPEEDY TRIAL ACT," and instructed the parties to notify the court

within ten days "THAT THEY OBJECT TO THIS TRIAL DATE AND INSIST, IN WRITING, ON A TRIAL DATE WITHIN THE SPEEDY TRIAL ACT DEADLINES." Despite the fact that the January 23, 2017, date was well outside the statutory Speedy Trial period, neither party objected or otherwise notified the court until well after the expiration of the speedy trial period, which occurred on December 6, 2016.[7]

On December 28, 2016, Ochoa's defense counsel filed a motion to withdraw, which the district court eventually granted, following a hearing, on January 25, 2017. In its order granting the motion to withdraw, the district court continued the trial on Count Three. Soon thereafter, successor defense counsel requested an additional 60 days continuance to prepare for trial, which the district court granted. The district court ultimately set a trial date on Count Three for June 5, 2017, with the order again containing language notifying the parties that the trial date may be set outside the time limits of the Seedy Trial Act.

On April 3, 2017, Ochoa, represented by successor defense counsel, moved to dismiss Count Three under the Speedy Trial Act, noting that approximately 90 days had lapsed between the September 27, 2016, mistrial and December 28, 2016,

---

[7]The district court calculated the 70-day Speedy Trial period as beginning on September 28, 2016 (the day after the mistrial on Count Three) and ending on December 6, 2016. Whatever the correct calculation, it is undisputed that Ochoa was not retried within the applicable 70-day period.

when prior counsel had moved to withdraw.  The government agreed that Count Three was subject to dismissal, but asked the district court to dismiss the charge without prejudice.  On May 9, 2017, the district court granted Ochoa's motion but agreed to dismiss Count Three without prejudice after considering the relevant statutory factors.

Meanwhile, Ochoa had been transported to Coleman Penitentiary to begin serving his federal sentence on Counts One and Two.  Because Ochoa's presence was again needed in Miami for his trial on Count Three, on April 3, 2017, the government secured a writ of ad prosequendum so that Ochoa could be transferred to the federal detention center in Miami.  Although the district court had dismissed Count Three without prejudice on May 9, Ochoa was transferred to the federal detention center in Miami on May 22, 2017, pursuant to the previously issued writ. He remained there through at least August 2017.

On August 22, 2017, the government obtained a new indictment against Ochoa, again charging him with knowingly possessing a firearm and ammunition as a convicted felon, in violation of § 922(g)(1).[8]  Like the superseding indictment filed in the first case, the new indictment specifically charged that Ochoa, "having

---

[8] The new indictment included a single felon-in-possession count, which was identical to Count Three in the superseding indictment filed in the first case.  For ease of reference, we will continue to refer to this felon-in-possession count as "Count Three" throughout this opinion.

previously been convicted of a crime punishable by imprisonment for a term

exceeding one year, did knowingly possess a firearm and ammunition."  The

indictment alleged that the firearm and ammunition were:

    a.  One (1) Heckler & Koch, .45 caliber semi-automatic pistol;[9]

    b.  Twenty (20) rounds of Hornaday, .45 caliber ammunition;

    c.  Two (2) rounds of "R-P" Remington, .45 caliber ammunition;[10]

        and

    d.  Thirty-two (32) rounds of Speer, .45 caliber ammunition.[11]

Ochoa moved to dismiss the new indictment under the Speedy Trial Act,

arguing the government had failed to indict him within 30 days of his "arrest."

Ochoa insisted that his presence at the federal detention center pursuant to the writ

---

[9]Government's Exhibits 21F, 21G, 21I, 22, and 23 collectively show the black Heckler & Koch case and its contents—a Heckler & Koch handgun and three loaded magazines—that agents discovered in the yard just outside Ochoa's house.

[10]Government's Exhibits 9L, 9M, and 9N show the Hornady box—which contains four rounds of .45-caliber ammunition—and the large capacity magazine, first in the drawer where agents discovered them and then on top of the dresser.  Government's Exhibit 13 then shows that magazine unloaded and the same Hornady box, now containing 16 more rounds of Hornady .45-caliber ammunition after, according to Agent Kaelin, someone "placed the rounds from the magazine in the box."  The four rounds in the Hornady box in the drawer, plus the 16 rounds from the magazine now placed in that Hornady box, yield the total 20 Hornady rounds.  Exhibit 13 also shows the two other rounds from the magazine.

[11]Government's Exhibit 21G shows the black gun case opened with the three loaded magazines.  Government's Exhibit 24 shows the three magazines found in that gun case, unloaded, and their contents: 31 rounds of Speer ammunition.  Agent Kaelin testified that all of the ammunition recovered from those magazines was .45-caliber Speer brand ammunition.  Government's Exhibits 19C, 19D, 19E and 20 show the final round of Speer ammunition, which is the stray bullet recovered from the yard, and which Agent Kaelin also identified as Speer brand.

of ad prosequendum in the absence of any operative indictment amounted to an

"arrest" for purposes the Speedy Trial Act, which restarted the Act's 30-day clock.

As a result, he argued, the government's August 22, 2017, indictment—90 days

after his transfer to the federal detention center in Miami on May 22, 2017—was

untimely.

The government opposed Ochoa's motion to dismiss, arguing Ochoa

remained detained following the dismissal of Count Three not because he was

being held pending indictment, but because he was serving a prison sentence

imposed on Counts One and Two.  Thus, his continued detention at the federal

detention center, even after the dismissal of Count Three did not constitute a new

"arrest" for purposes of the Speedy Trial Act.  The district court agreed with the

government and denied Ochoa's motion to dismiss.

## V. RETRIAL ON COUNT THREE

In October 2017, the case proceeded to trial.  For purposes of this retrial, the

district court allowed Ochoa to adopt several motions and objections already made

concerning evidence presented at the first trial, including the objections raised in

his motion to suppress statements and evidence.  Because Ochoa challenges this

conviction too based on the sufficiency of the evidence, we will review more of the

evidence presented at the retrial on Count Three.

## A. The Government's Evidence

During the retrial, the government presented evidence from eight witnesses, over the course of two days. The government's theory was that Ochoa constructively possessed the gun and three magazines of Speer ammunition in the black gun case that was discovered outside his residence, as well as the Hornady and Remington ammunition found in the drawer in the bedroom. As to how the black gun case ended up in a bush outside the residence, the government argued to the jury that, while agents were securing the residence and awaiting a search warrant, Ochoa's brother, Angel, while pretending to relieve himself, entered the residence, took the black gun case out of the bedroom drawer, and threw it in the bushes in an effort to "get rid of what he thinks is the thing that is getting his big brother in trouble."

At the start of the trial, Ochoa stipulated that he was convicted previously of two felonies involving the knowing possession of a firearm, although no facts of the crimes were disclosed. The government eventually presented this stipulation to the jury, pursuant to Rule 404(b) of the Federal Rules of Evidence, "for the limited purpose of assisting [the jurors] in determining whether [Ochoa] had the state of mind or the intent necessary to commit the crime charged in the indictment, and whether [Ochoa] committed the acts charged in the indictment by accident or by mistake."

The government first called Agent Swinerton, who led the SWAT team that arrested Ochoa.  Agent Swinerton testified as to the details of Ochoa's arrest and subsequent pre-<u>Miranda</u> questioning, as we have detailed them above, including his brief detention of Ochoa, his brother Angel, and a third male occupant of the residence, and Ochoa's verbal statement that there was a gun inside the residence in a drawer in a bedroom.

Special Agent Matthew Carpenter also testified.  He similarly recounted events, briefly discussed above, concerning the discovery outside the residence of a stray bullet and a black gun case.  Notably, Carpenter testified that he—along with another FBI agent (Special Agent Jason May)—arrived at the residence just after the SWAT team left, and was tasked with ensuring that no one entered or exited the residence until officers obtained a search warrant.  At some point, one of the occupants of the residence, later identified as Ochoa's younger brother Angel, approached Agent May and asked to use the restroom.  Angel was told he could not enter the residence, but he was permitted to go to the side yard for privacy. Angel walked along the west side of the residence toward the backyard, and he then disappeared around the corner of the residence.  After what Agent Carpenter believed to be an unusually long time had passed and Angel had not returned, Agent Carpenter walked around to the back of the residence and saw Angel walking toward him, coming from the east side yard.  Agent Carpenter found

Angel's movements suspicious, as it seemed unnecessary for Angel to walk all the way to the other side of the residence for privacy.

Agent Carpenter walked over to the east side of the residence (from which Angel had just come) and found on the ground a .45-caliber bullet—which he described as "shiny" and "new"—along with a black gun case in some nearby bushes.  Agent Carpenter also discovered that the residence's back door was unlocked.  When Agent Carpenter discovered the bullet and gun case, he called Agent May over to look.  Agent May retrieved the black gun case and confirmed there was a gun inside.  At that point, Agent May placed the black gun case back in the bushes and called Agent Kaelin over to photograph and take custody of the items.

Once the search warrant was obtained, Agent Carpenter participated in the search of the residence and property.  As is relevant here, he searched a red Mercedes that was parked on the front lawn and found a Florida driver's license bearing Ochoa's name, which listed his address as the residence at issue.

Agent May also testified, confirming Agent Carpenter's recitation of the discovery of the black gun case.  Agent May was shown a picture of the contents of the black case, which he identified as  a .45-caliber Heckler & Koch handgun, along with three magazines, which he stated were filled with Speer brand ammunition.

Special Agent Matthew Lanthorn testified that he also was present for Ochoa's interview with Officer Starkey.  Through Agent Lanthorn, the government again submitted several clips of the interview.

Agent Kaelin testified next, describing, as he did in the first trial, the execution of the search warrant.  Agent Kaelin discussed his discovery of several of Ochoa's personal items, including another driver's license, mail, and travel documents, all of which bore Ochoa's name.  Agent Kaelin also found a Samsung cellphone, which was assigned to the user "Ochoa, Daniel," and which contained a photo of Ochoa.  Agent Kaelin identified a video, recovered from one of the cellphones found in the bedroom, which showed Ochoa lying on the bed in the room with an unidentified woman.

Agent Kaelin further testified that, upon searching a "nightstand" in the bedroom, he discovered, in a drawer, an empty gun holster, a large capacity magazine loaded with .45-caliber rounds and a box containing four rounds of .45-caliber Hornady brand ammunition.  No firearm was recovered from the bedroom.

Finally, the government called two FBI analysts.  The first analyst testified that she was asked to examine several of the recovered items for fingerprints: the firearm, several magazines, cartridges, and the box of Hornady ammunition.  She was only able to recover latent prints of value from the bullet tray inside the

30

ammunition box, and those prints did not match Ochoa's.  However, she stated that, in her experience, latent prints of value are rarely recovered from firearms and ammunition, and the fact that she was unable to recover any fingerprints of value from the firearm she tested did not mean that Ochoa never touched it.

The second analyst testified that he was asked to process the gun for any DNA evidence and compare any DNA recovered to a reference sample from Ochoa.  The results were inconclusive, meaning the analyst could neither include nor exclude Ochoa as a possible contributor to the DNA found on the gun, primarily because the DNA profile on the gun was too limited to be used for matching purposes.  The analyst, however, could confirm that the contributor was male.

At the close of the government's case, Ochoa moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal, arguing the government had failed to show that Ochoa actually or constructively possessed the firearm recovered from the yard, nor had the government established that he possessed either the ammunition recovered from the yard or the ammunition discovered in the bedroom drawer.  In making this argument, Ochoa's defense counsel noted that "the [g]overnment's case is essentially that because the bullets were found in Mr. Ochoa's drawer, which was located in a room in which he slept, he constructively possessed the bullets, and inferentially he constructively possessed the firearm

which was located outside."  Defense counsel maintained that no reasonable juror

could "accept that the drawer was Mr. Ochoa's or that the room was Mr. Ochoa's

such that he had the right of exclusion and of dominion and control over that

particular drawer's contents."  The district court denied the motion for judgment of

acquittal, and Ochoa rested without putting on any evidence.

## B. The Verdict and Sentence

After deliberating, the jury found Ochoa guilty of knowingly possessing a

firearm and ammunition as a convicted felon.  The PSR calculated a total offense

level of 28, consisting of: (1) a base offense level of 26, pursuant to U.S.S.G.

§ 2K2.1(a)(1); and (2) a two-level increase, pursuant to U.S.S.G. § 2K2.1(b)(4)(A),

because the firearm Ochoa possessed was reported stolen.  Section 2K2.1(a)(1)

provides for a higher base offense level of 26 when (1) the offense involved a

"semiautomatic firearm that is capable of accepting a large capacity magazine";

and (2) the defendant committed the offense after sustaining two felony

convictions for a "crime of violence."  U.S.S.G. § 2K2.1(a)(1).  The PSR identified

the same two prior Florida convictions that underlaid his career-offender

designation in the first sentencing proceeding: attempted armed robbery and

second-degree murder.

Ochoa's total offense level of 28 and criminal history category of V resulted

in an advisory guidelines range of 130 to 162 months' imprisonment.  Because the

statutory maximum penalty for Ochoa's § 922(g) conviction was 120 months'

imprisonment, that maximum sentence became the advisory guidelines sentence.

See U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is

less than the minimum of the applicable guideline range, the statutorily authorized

maximum sentence shall be the guideline sentence.").

Prior to sentencing, Ochoa filed written objections to, inter alia, the

application of the higher base offense level of 26 under § 2K2.1(a)(1).  He argued

that this higher base offense level was not properly applied to him because: (1) his

convictions for attempted armed robbery and second-degree murder did not qualify

as crimes of violence under U.S.S.G § 4B1.2; and (2) the firearm in the yard was

not found in close proximity to the large capacity magazine found in the bedroom

drawer.

Regarding his prior convictions, Ochoa argued that Florida attempted armed

robbery and Florida second-degree murder did not qualify as crimes of violence

under either the elements or enumerated offenses clauses of § 4B1.2, though he

acknowledged that at least his objection to the use of the attempted armed robbery

conviction was precluded by this Court's decision in United States v. Lockley, 632

F.3d 1238 (11th Cir. 2011).  In response, the government—in addition to relying

on Lockley—argued that second-degree murder under Florida law requires the use

of physical force, and it therefore qualifies as a crime of violence under

§ 4B1.2(a)'s elements clause.

At the sentencing hearing, the district court overruled Ochoa's objections. As to his objection that his prior Florida convictions were not crimes of violence, the district court noted that it was "going to adopt the rationale of the [g]overnment without going through all the details." As to whether the firearm found in the yard was in "close proximity" to the large capacity magazine in the bedroom drawer, the district court reasoned that there was "strong evidence" that the firearm "was taken out by that young man [Angel] who, somehow, conned the officers to allow him to go back in to relieve himself and, at that time, went into the house, took out the firearm, the other magazines fully loaded with [.45-caliber] ammunition but, for some reason, forgot or missed the fourth magazine."

Accordingly, the district court sentenced Ochoa to 120 months' imprisonment on Count Three, all but 30 months of which would run concurrently with his 360-month sentence imposed on Counts One and Two. Ochoa appealed, generating case no. 18-10142 in this Court, which subsequently was consolidated with appeal no. 16-17609. We now address Ochoa's claims of error arising out of both proceedings.

## VI. CROSS-EXAMINATION OF OFFICER STARKEY

On appeal, Ochoa argues the district court erred in granting the government's motion in limine, thereby limiting his cross-examination of Officer Starkey in the first trial on Counts One and Two.  Ochoa contends that the evidence concerning Officer Starkey's misuse of police department computers, and, crucially, his efforts to conceal that misuse, was admissible under Rule 608(b) to show his character for untruthfulness.  Ochoa argues the district court's refusal to allow cross-examination on these topics deprived him of his Sixth Amendment right to confront a key witness against him.[12]

We have recognized the importance of the right to full cross-examination, particularly when applied to the government's "star" witness or one who provides an "essential link" in the government's case.  United States v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992) (quotation marks omitted).  However, this right is "not without limitation," and a defendant "is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  United States v. Jeri, 869 F.3d 1247, 1262 (11th Cir.) (quotation marks omitted), cert. denied, 138 S. Ct. 529 (2017).

---

[12]"The trial court has broad discretion under [Federal Rule of Evidence] 611(b) to determine the permissible scope of cross-examination and will not be reversed except for clear abuse of that discretion."  United States v. Jones, 913 F.2d 1552, 1564 (11th Cir. 1990); see also Fed. R. Evid. 611(b).  "The denial of a defendant's Confrontation Clause right to cross-examination is examined for harmless error."  United States v. Ndiaye, 434 F.3d 1270, 1286 (11th Cir. 2006).

Additionally, while extrinsic evidence is generally inadmissible to prove specific instances of a witness's conduct, "the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b). Even relevant evidence, however, may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see also Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.").

Considering these standards, we conclude that the district court acted well within its discretion in limiting Ochoa's cross-examination of Officer Starkey. We acknowledge that Officer Starkey's misconduct—particularly his attempt to destroy evidence of his misuse of police department computers—is relevant to his character for truthfulness or lack thereof. However, we agree with the district court that such relevance is only marginal in this particular case, and we cannot say that that the district court's decision to exclude the evidence out of concern that it

would confuse or mislead the jury was so unreasonable as to constitute an abuse of discretion.  See Van Arsdall, 475 U.S. at 679, 106 S. Ct. at 1435.

As to relevancy, Ochoa insists the fact that Officer Starkey previously attempted to destroy evidence of, and lied about, his misuse of police department computers was relevant to whether the jury should credit his testimony.  While Officer Starkey's conduct may bear on his character for truthfulness generally, it does not, as Ochoa appears to contend, bear directly on whether Officer Starkey is likely to have engaged in any misconduct during the course of a criminal investigation in which he was not charged and was only testifying.  In both instances of misconduct, Officer Starkey engaged in deception to conceal embarrassing personal behavior, not to falsify or manipulate evidence in an ongoing criminal investigation of another person.

The probative value of the disciplinary incidents at issue is further diminished by their age.  Both of the incidents occurred in 2003 and 2004, over 12 years before Ochoa's trial in September 2016.  Although Rule 608(b) does not place any temporal limitation on evidence of specific instances of witness conduct, the remoteness of the incidents in question may nonetheless bear on their relevance.  See United States v. Novaton, 271 F.3d 968, 1004–07 (11th Cir. 2001) (affirming district court's decision to limit cross-examination of an officer

concerning a 6-year-old misconduct investigation, in part because "the investigation was temporally remote from [the officer's] testimony").

As to whether the evidence of Officer Starkey's disciplinary incidents was likely to confuse or mislead the jury, the district court reasonably concluded that the jury was likely to focus on the underlying incidents that led to Officer's Starkey's deceitful conduct—using a department computer to send inappropriate emails and download sexually explicit images—as opposed to his attempts to cover up or lie about those incidents. On appeal, Ochoa argues the district court could have "limited [the] area of inquiry" so as to avoid focusing on some of the more prurient details of the misconduct. But it is difficult to extricate Officer Starkey's deceitful conduct from the underlying actions he attempted to conceal.

Moreover, as an independent and alternative ground for affirming the district court's ruling, we conclude that any denial of Ochoa's rights under the Confrontation Clause was harmless. See Ndiaye, 434 F.3d at 1286. Ochoa characterizes Officer Starkey as a "key witness" for the government, but this description goes too far. Ochoa notes that Starkey was the lead investigator, interviewed Ochoa, and showed the photo lineup to two eyewitnesses who identified Ochoa as the robber. However, based on our review of the record, Officer Starkey's testimony served two primary purposes: (1) as a means to introduce the excerpts of Ochoa's post-Miranda interview; and (2) to establish that

the person depicted in the photograph chosen out of the photo lineup by each of the witnesses was Ochoa, as none of the witnesses made in-court identifications.

As to the former, Officer Starkey's credibility did not have any bearing on the weight jurors gave to Ochoa's statements during the interview. Because the jury was able to view and hear the video and audio recording themselves, they did not need to rely on Officer Starkey's characterization of Ochoa's statements.

As to Officer Starkey's testimony concerning the photo lineup, Ochoa seems to suggest that undermining Officer Starkey's character for truthfulness would have called into question Officer Starkey's assertion that he did not exert undue pressure on any of the witnesses during the photo lineup procedure. But those witnesses themselves were subject to rigorous cross-examination, during which they could have testified to any inappropriate conduct by Officer Starkey. Thus, simply undermining Officer Starkey would not have been enough to call the identifications into question; Ochoa would have had to similarly call into question the credibility of the three witnesses, none of whom testified they felt any undue pressure to make a particular selection or any selection at all.

The only potential contradiction between the testimony of the witnesses and Officer Starkey—which Ochoa pointed out to the district court in arguing his position at trial—was Montenegro's testimony that he initially had trouble choosing between two photographs. Officer Starkey testified he did not recall any

of the witnesses saying he could not choose between two photos and stated that
any such response would have constituted a "non-identification."  We are not
persuaded, however, that Montenegro's initial indecision was particularly
meaningful, especially given his subsequent testimony that he "was completely
sure" of his eventual identification.

## VII. <u>MIRANDA</u> VIOLATIONS

Ochoa next argues the district court erred in denying his motion to suppress
his pre- and post-<u>Miranda</u> statements and any evidence derived therefrom.[13]  He
first argues the district court erred in allowing Agent Swinerton to testify, during
the retrial on Count Three, as to Ochoa's pre-<u>Miranda</u> statements concerning the
presence of a gun in the residence.  He disputes the district court's conclusion that
these statements fell within the public safety exception to <u>Miranda</u>.  Second, Ochoa
argues the district court erred by denying his motion to suppress statements he
made to Officer Starkey during his post-<u>Miranda</u> interview, portions of which the
government played for the jury at both trials.  Ochoa challenges the district court's
finding that he did not unambiguously invoke his right to counsel or his right to

---

[13]Ochoa does not specify what evidence he believes was derived from his statements.  As
discussed above, the magistrate judge made an explicit finding that, even excluding the
challenged statements, the search warrant was supported by ample probable cause.  In this
appeal, Ochoa does not appear to contest this ruling, and he offers no argument concerning the
validity of the search warrant.  However, as we conclude the statements themselves were not
taken in violation of <u>Miranda</u>, we need not address whether any evidence derived therefrom
should have been excluded.

remain silent during his interview with Office Starkey.  We will address each set of statements in turn.[14]

## A. Pre-**Miranda** Statements (Public Safety Exception)

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Supreme Court has construed this protection to mean that custodial interrogation generally cannot occur before a suspect is informed of his Miranda rights.  New York v. Quarles, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630 (1984).  Here, there is no dispute that Ochoa was "in custody" for Miranda purposes at the time Agent Swinerton questioned Ochoa about the presence of weapons in the residence, as he was handcuffed outside the home.  Thus, Agent Swinerton's questioning was presumptively impermissible absent some exception to Miranda.

In New York v. Quarles, the Supreme Court established an exception for public safety to the Miranda rule.   467 U.S. at 655–58, 104 S. Ct. at 2631–32. This public safety exception allows law enforcement officers to question a suspect without first informing him of his Miranda rights when they reasonably believe doing so is necessary to protect either the officers or the public.  Id. at 657–59, 104

---

[14]"A denial of a motion to suppress involves mixed questions of fact and law. We review factual findings for clear error, and view the evidence in the light most favorable to the prevailing party.  We review de novo the application of the law to the facts."  United States v. Barber, 777 F.3d 1303, 1304 (11th Cir. 2015) (citations omitted).

S. Ct. at 2632–33.  The Supreme Court reasoned that we do not want "to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the <u>Miranda</u> warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them."  <u>Id.</u> at 657–58, 104 S. Ct. at 2632.  As a result, the Court explained, "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."  <u>Id.</u> at 657.

This Court has found the public safety exception applicable in a case that is similar to this one.  <u>See</u> <u>United States v. Newsome</u>, 475 F.3d 1221 (11th Cir. 2007).  In that case, officers apprehended defendant Newsome in a motel room. 475 F.3d at 1222–23.  The officers had reason to believe there was another person in the room with Newsome at the time, and they knew that Newsome was "a violent offender with a previous record and possibly in possession of a gun."  <u>Id.</u> at 1223.  After securing the defendant with handcuffs, one officer asked the defendant if there was "anything or anyone in the room that [the officer] should know about."  <u>Id.</u>  The defendant advised the officer that he had a gun "over there,"

and motioned with his head towards a nightstand.  Id.  When the officer did not see

the gun, he asked the defendant where it was, and the defendant pointed the officer

to a black bag containing the weapon.  Id.

In Newsome, this Court concluded the public safety exception applied,

noting that the officers had "asked what was necessary to secure the scene" given

the officers' impression that there were at least two people in the room and that

they were dealing with a possibly armed, violent felon.  Id. at 1225.  Under these

circumstances, we reasoned, "[t]he officers reasonably believed that they were in

danger, and they acted accordingly to protect themselves."  Id.  We noted that the

officer's "broad phrasing"—i.e., his query about "anything" he needed to know

about—was not problematic, despite the risk that his question might have elicited

information not pertinent to the officers' safety.  Id.  This was because "[a]n officer

is not expected to craft a perfect question in the heat of the moment."  Id.  (citing

United States v. Williams, 181 F.3d 945, 954 n.13 (8th Cir. 1999) (noting that

"conditioning admissibility of evidence under the public safety exception on an

officer's ability to ask questions in a specific form would run counter to the

Quarles Court's decision that an officer may forego announcement of Miranda

warnings when public safety is threatened")).

Here, we similarly conclude that Agent Swinerton asked questions he

reasonably believed were necessary to secure the scene following Ochoa's arrest.

43

Like the officers in <u>Newsome</u>, Agent Swinerton knew he was dealing with a potentially violent suspect who was in possible possession of a firearm.[15]  After all, the offense for which law enforcement had probable cause to arrest Ochoa was an armed robbery during which the robber shot a Brink's messenger.  While Agent Swinerton may not have had a specific reason to suspect that any particular person remained in the residence—as was the case in <u>Newsome</u>—his concern that other individuals might have remained in the residence, despite Ochoa's statements to the contrary, was reasonable, considering the number of people who had already emerged from the house at that point.  And as Agent Swinerton testified, if the agents were to discover "additional individuals" upon entering the home, "and [the agents] know there[] [are] weapons in the house, it[] [is] going to change, potentially, what [they] do."

Given these facts, Officer Swinerton reasonably believed that he or his team members could be in danger upon entering the residence, and he took appropriate

---

[15]The dissent attempts to distinguish this case from <u>Newsome</u> and <u>Quarles</u>, in part, because this case involves the search of a private residence, and, therefore, there was no risk that members of the public might stumble upon any weapon present.  But while technically in a larger public space (a motel), <u>Newsome</u> still involved a small, private space that, at the time, was occupied by the defendant and was not open to the public.  In any event, the public safety exception applies whether the danger is to the public generally or to the officers alone.  <u>See</u> <u>Quarles</u>, 467 U.S. at 658–59, 104 S. Ct. at 2633 (noting that police officers may ask "questions necessary to secure their own safety or the safety of the public"); <u>Newsome</u>, 475 F.3d at 1225 ("The [public safety] exception to <u>Miranda</u> also applies where there is a threat to the officers rather than the public.").

action, even specifically communicating to Ochoa and the other occupants of the

residence that he was trying to ascertain "if there's anything that could hurt my

guys before we go in."[16]  Notably too, it appears that Ochoa's statement about the

gun in the bedroom drawer was in direct response to this general statement by

Agent Swinerton, not to his specific question about "[b]ombs, booby traps, [and]

weapons."  For all of these reasons collectively, we conclude Ochoa's statements

to Agent Swinerton fall under the public safety exception to <u>Miranda</u> and were

properly admitted during Ochoa's retrial on Count Three.

## B. Post-<u>Miranda</u> Statements (Invocation of Rights)

"When a person undergoing a custodial interrogation states that he wishes to

remain silent the questioning must end, and if he expresses a desire to consult with

an attorney, the questioning must cease until one is provided for him."  <u>United

States v. Acosta</u>, 363 F.3d 1141, 1151 (11th Cir. 2004) (citing <u>Miranda</u>, 384 U.S.

at 473–74, 86 S. Ct. at 1627–28).  However, the suspect's invocation of his rights

must be unequivocal.  <u>Davis v. United States</u>, 512 U.S. 452, 461–62, 114 S. Ct.

2350, 2356 (1994).

---

[16]The dissent focuses particularly on Agent Swinerton's use of the word "weapon,"
arguing it was fine for him to ask about bombs, booby traps, or other self-executing hazards but
not "non-self-executing weapons," which become harmful only when wielded by a person.
However, we are not required to parse Agent Swinerton's precise wording in such a manner or to
focus on one word, given the officers had reason to believe there may have been additional
people in the residence who may have had access to a weapon.  See <u>Newsome</u>, 475 F.3d at 1225.

"If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."  Id.  In other words, a suspect must articulate his desire with sufficient clarity that a "reasonable police officer in the circumstances would understand the statement to be a request for an attorney" or to cease further questioning.  Id. at 459, 114 S. Ct. at 2355; see also Coleman v. Singletary, 30 F.3d 1420, 1423 (11th Cir. 1994).

Here, we must determine whether Ochoa's statements that he did not "agree with" the statement that he was "willing to answer questions without a lawyer present" and his initial hesitancy to sign the waiver constituted an "unambiguous or unequivocal" invocation of either his right to counsel or to remain silent.  See Davis, 512 U.S. at 461–62, 114 S. Ct. at 2356.  After careful review, we conclude Ochoa did not successfully invoke his right to counsel or his right to remain silent.

As a preliminary matter, we note that it is undisputed that Ochoa did not expressly state that he wished to consult an attorney or to remain silent.  See Berghuis v. Thompkins, 560 U.S. 370, 382, 130 S. Ct. 2250, 2260 (2010) ("[The defendant] did not say that he wanted to remain silent or that he did not want to talk with the police.  Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning.  Here he did neither, so he did not invoke his right to remain silent." (quotation marks and citation omitted)).

As to the statements he did make—that he didn't "really agree" with the Waiver of Rights provision on the Advice of Rights form—while one possible interpretation of Ochoa's responses could be that he did not wish to answer questions at that point without a lawyer present, those statements are also consistent with an expression of confusion as to what he was agreeing to by signing the waiver form, which is how Officer Starkey claimed to have understood them.  This understanding of Ochoa's statements—that he was confused and required clarification—is also consistent with Ochoa's apparent belief that he was agreeing to "cooperate" by consenting to the interview.  Under these circumstances, it was appropriate for Officer Starkey to ask follow-up questions to clarify what Ochoa meant by his ambiguous statements.  See Medina v. Singletary, 59 F.3d 1095, 1105 (11th Cir. 1995) (holding it was appropriate for an officer to ask a clarifying question in response to a defendant's ambiguous statement concerning his right to remain silent).  Once Officer Starkey offered a brief explanation of the waiver provision, Ochoa quickly assented, further indicating he had only been confused previously and had not invoked his right to counsel or to remain silent.

Because Ochoa did not unequivocally and unambiguously invoke either his right to counsel or his right to remain silent, Officer Starkey was not obligated to forgo the interview, and any statements Ochoa made therein were properly

admitted into evidence at trial. This is particularly true where, after clarification, Ochoa indicated in the affirmative that he would "speak without an attorney."

Alternatively, Ochoa has not demonstrated that he suffered any harm as a result of the admission of any statements made during the interview. See United States v. Arbolaez, 450 F.3d 1283, 1292 (11th Cir. 2006) ("The admission of statements obtained in violation of Miranda is subject to harmless error scrutiny." (quotation marks omitted)).  On appeal, he does not refer to any particular statement that was admitted at either trial, and he makes no argument concerning the effect at trial of any allegedly ill-gotten statements.  Indeed, Ochoa's recitation of the evidence presented during both trials does not mention any specific statements that he made during the interview.

As to the portions of the interview that were shown to the jury during the trial on Counts One and Two, Ochoa did not confess to the crime or otherwise directly implicate himself in the charged robbery.  In fact, the final clip that the government played for the jury actually depicts Ochoa steadfastly denying that he committed any crime.

As to the trial on Count Three, our review of the record indicates that the primary evidentiary value of Ochoa's interview statements was in reiterating that Ochoa knew there was a gun in a drawer in the house and that the drawer in question was in his bedroom.  As to the first point, as we discussed above, the

district court properly allowed Agent Swinerton to testify as to Ochoa's

pre-<u>Miranda</u> statement that there was a firearm in the house in a drawer.

Concerning the second point, as we discuss below, the jury was presented with

ample circumstantial evidence from which it could have reasonably concluded that

the bedroom in which the ammunition was found was Ochoa's.

Thus, as an independent basis for affirming the district court's ruling on

Ochoa's motion to suppress his post-<u>Miranda</u> statements, we conclude that even

assuming it was error to admit the statements, the error was harmless and does not

merit reversal.

## VIII. SPEEDY TRIAL ACT

Ochoa next contends the district court erred under the Speedy Trial Act in

two ways, which we address separately.

## A. Dismissal of Count Three Without Prejudice

First, Ochoa argues the district court should have dismissed Count Three of

the original indictment with prejudice.[17]  The Speedy Trial Act provides that, "[i]f

the defendant is to be tried again following a declaration by the trial judge of a

mistrial or following an order of such judge for a new trial, the trial shall

commence within seventy days from the date the action occasioning the retrial

---

[17]"We review for an abuse of discretion whether a district court should dismiss an indictment with or without prejudice for a violation of the Speedy Trial Act." <u>United States v. Knight</u>, 562 F.3d 1314, 1321 (11th Cir. 2009).

becomes final." 18 U.S.C. § 3161(e). Following the mistrial in Ochoa's first trial on Count Three, the retrial did not occur within 70 days, and the parties agree that Count Three of the original indictment was subject to dismissal under the Speedy Trial Act. The only issue on appeal is whether the district court acted within its discretion in dismissing Count Three without prejudice, rather than with prejudice.

A district court has the discretion to dismiss an indictment with or without prejudice under the Speedy Trial Act and must consider three factors when determining the method of relief: (1) "the seriousness of the offense"; (2) "the facts and circumstances of the case which led to the dismissal"; and (3) "the impact of a reprosecution on the administration of this chapter and on the administration of justice." 18 U.S.C. § 3162(a)(2). "[T]he proper dismissal sanction to be imposed in each case is a matter left to the exercise of the sound discretion of the trial judge after consideration of the factors enumerated in the statute." United States v. Russo, 741 F.2d 1264, 1267 (11th Cir. 1984). The judgment of the district court "should not lightly be disturbed" if the district court has considered all of the statutory factors and if the underlying factual findings are not clearly erroneous. United States v. Taylor, 487 U.S. 326, 337, 108 S. Ct. 2413, 2420 (1988).

After reviewing the record, we readily conclude that the district court did not abuse its discretion in this case. As to the first factor, the district court determined that the possession of a firearm and ammunition by a convicted felon is a serious

offense.  Ochoa does not contest this conclusion, nor could he, as we have expressed a similar sentiment on numerous occasions.  See, e.g., United States v. Jones, 601 F.3d 1247, 1257 (11th Cir. 2010) ("[P]ossession of ammunition by a convicted felon and drug user are clearly serious crimes."); Knight, 562 F.3d at 1323 ("The district court correctly determined that the statutory minimum sentence of ten years of imprisonment [for possession of a firearm by a convicted felon] reflects the seriousness of Knight's offense.").

Instead, Ochoa argues that the "seriousness of the offense" should nonetheless weigh against dismissal without prejudice in this case because "the pending charge subject to dismissal was less serious than [his] crimes of conviction [in Counts One and Two] for which he is serving 30 years in federal prison." Ochoa, however, points to no precedent, and we are not aware of any, indicating that a district court's analysis under § 3162(a)(2) should focus on the seriousness of the offense relative to other offenses for which the defendant was already convicted.  And we see no reason to reward Ochoa in the Speedy Trial analysis because he committed more serious crimes than the one at issue.

The district court's written order also reflects its reasoned consideration of the remaining two factors.  As to the facts and circumstances leading to the dismissal, the district court admittedly scheduled the retrial on Count Three outside the 70-day window prescribed by the Speedy Trial Act.  However, the district court

correctly noted that neither party alerted the court to this Speedy Trial Act issue, despite the district court's explicit request that the parties notify the court if the scheduled date for retrial was outside the Speedy Trial Act deadline.  The parties also apparently failed to comply with a local rule that required counsel to file periodic reports indicating, among other things "the final date upon which the defendant can be tried in compliance with the Speedy Trial Plan of this Court." See S.D. Fla. L.R. 88.5.

As the district court also noted, the Speedy Trial Act violation was complete in early December of 2016, well before successor defense counsel entered the case in January 2017 and requested an additional 60-day delay to prepare for trial. Given that the fault for the delay cannot be attributed solely, or even primarily, to any particular party, we cannot say the district court clearly erred in concluding the second factor weighed in favor of dismissal without prejudice.  See Taylor, 487 U.S. at 337, 108 S. Ct. at 2420.

As to the third factor, the district court correctly determined that Ochoa failed to identify any prejudice resulting from the delay that has impacted his defense or ability to prepare for trial.  Ochoa's briefs on appeal are similarly silent as to this third factor, save for his conclusory assertion that "each of the[] factors favor[s] dismissal with prejudice."

Accordingly, we conclude that the district court did not abuse its discretion in dismissing Count Three of the original indictment without prejudice.

## B. Ochoa's Motion to Dismiss the Second Indictment

Ochoa next argues the district court erred in denying his motion to dismiss the second indictment under the Speedy Trial Act on the ground it was not filed within 30 days of his "arrest" for being a felon in possession of a firearm and ammunition.  Here are the facts Ochoa uses to construct this argument.

Ochoa was serving his 360-month sentence on his Counts One and Two convictions at a federal penitentiary.  On May 9, 2017, the district court entered its order dismissing Count Three of the original superseding indictment.  Despite this, Ochoa was transferred, on May 22, 2017, from the federal penitentiary to the federal detention center in Miami, pursuant to an earlier-issued writ of <u>ad prosequendum</u>, ostensibly so that he would be available for his Count Three trial which had been scheduled for June 5, 2017.  He remained at the federal detention center in Miami through at least August 29, 2017 (the date on which he filed his motion to dismiss the new indictment).

Ochoa acknowledges that he was transferred to the federal detention center to await trial on Count Three, not because he was arrested.  Ochoa, however, insists that, once Count Three was dismissed on May 9, 2017, and he was nonetheless transferred to the federal detention center pursuant to the writ of <u>ad</u>

prosequendum, his detention "in connection with" the felon-in-possession charge

amounted to an "arrest" under the Speedy Trial Act.  Based on this contention,

Ochoa reasons that the government was obligated to file the new indictment on the

felon-in-possession charge within 30 days of his May 22, 2017, arrival at the

federal detention facility, which it did not do.  The new indictment was not filed

until August 22, 2017.

   We are not persuaded by Ochoa's argument.  The Speedy Trial Act provides

that an "indictment charging an individual with the commission of an offense shall

be filed within thirty days from the date on which such individual was arrested or

served with a summons in connection with such charges."  18 U.S.C. § 3161(b).  In

the ordinary case, the government holds a suspect in custody following his arrest in

anticipation of obtaining an indictment against him.  In such cases, the anticipated

indictment of that suspect may provide the legal justification for the government's

continued detention of the suspect.  Not so here.

   Because Ochoa was otherwise properly in federal custody serving the

sentences imposed on his Counts One and Two convictions, his continued presence

at the federal detention center in Miami did not constitute an "arrest" on Count

Three in any meaningful sense.  Ochoa's continued detention did not become an

"arrest" simply because of his being held at a pretrial detention facility, as opposed

to federal penitentiary, or because his presence at that facility was pursuant to a writ of <u>ad prosequendum</u>.

Ochoa's continued detention following the dismissal of Count Three—regardless of where that detention occurred—was not solely or even primarily based on an anticipated new indictment.  Instead, it was based on a valid criminal judgment.  Accordingly, we conclude Ochoa was not "arrested . . . in connection with" any pending charges while he was being held at the federal detention center in Miami, and we therefore find no error in the district court's denial of Ochoa's motion to dismiss the second indictment under the Speedy Trial Act.

## IX. SUFFICIENCY OF THE EVIDENCE

Ochoa maintains there was insufficient evidence to convict him any of the three charges against him.[18]  We first address his convictions for Hobbs Act robbery and use of a firearm together, before addressing his felon-in-possession conviction.

---

[18]"We review challenges to the sufficiency of the evidence to support a conviction de novo, viewing the evidence and all reasonable inferences derived therefrom in the light most favorable to the government."  <u>United States v. Baldwin</u>, 774 F.3d 711, 721 (11th Cir. 2014). To sustain a verdict of guilt, the evidence "need not exclude every reasonable hypothesis of innocence" or be "wholly inconsistent with every conclusion except that of guilt," as long as a "reasonable factfinder" choosing from among reasonable constructions of the evidence "could find that the evidence establishes guilt beyond a reasonable doubt."  <u>United States v. Kelly</u>, 888 F.2d 732, 740 (11th Cir. 1989).  "This standard of review applies to both direct and circumstantial evidence."  <u>United States v. Sepulveda</u>, 115 F.3d 882, 888 (11th Cir. 1997).

## A. Hobbs Act Robbery and § 924(c) Firearm Convictions

As to Counts One and Two, which were tried together at the first trial,

Ochoa's only contention on appeal is that the government failed to prove his

identity beyond a reasonable doubt.  After thorough review of the record, we

conclude there was ample evidence from which the jury reasonably could have

determined that Ochoa was the person who robbed the Brink's truck on August 15,

2014.

Three witnesses, including the victim, identified Ochoa as the robber in

independent photo lineups.  The first witness, who was also the victim, Perez,

testified that he was able to see his assailant's face "very clearly."  The other two

witnesses, Montenegro and Bermudez, saw the robbery take place and were able to

see the robber as he fled the scene.  Montenegro testified that he had seen the

robber's face as he fled and was "completely sure" of the accuracy of the

identification at the time he made it.  The third witness, Bermudez, also made an

identification, although he acknowledged that he was not able to see the robber's

face very well.

On appeal, Ochoa attempts to attack the credibility of the three witnesses,

arguing, for example, that they "had little opportunity to get a look at the robber."

But the fact that Ochoa can (and did) impeach the credibility of the witnesses is not

relevant to our inquiry here.  We must view the evidence in the light most

56

favorable to the government, which, in this case, means crediting the eye-witness

identifications that were presented to the jury.  See Baldwin, 774 F.3d at 721.

Ochoa also incorrectly claims that "the only evidence" against him as to

these charges "were from witnesses who picked him out of a photo lineup."  This

ignores several other significant pieces of circumstantial evidence tying Ochoa to

the robbery.  For starters, the government presented evidence discovered during the

search of Ochoa's residence, including evidence recovered from his bedroom—

specifically large amounts of new shoes and clothing, and a plane ticket to

Nicaragua, all purchased after the robbery—and $12,900 in cash stored in a freezer

and composed entirely of $100 bills, the same denomination of currency taken

from the Brink's truck.

Ochoa offers potential innocent explanations for all of these pieces of

evidence.  In particular, Ochoa notes that the presence of the cash and new

merchandise is consistent with someone running a "home business" out of the

residence, a possibility that Agent Kaelin acknowledged at trial.  But the evidence

need not be "wholly inconsistent with every conclusion except that of guilt" for us

to affirm the jury's verdict.  Kelly, 888 F.2d at 740.  Instead, we need only

conclude that a reasonable factfinder could, choosing among reasonable

constructions of the evidence, determine that the evidence established guilt beyond

a reasonable doubt.  Id.  The fact that one reasonable construction of the evidence

is consistent with Ochoa's innocence does not mean the jury's contrary construction was necessarily unreasonable.

Beyond the eye-witness identifications and powerful incriminating circumstantial evidence—especially the cash—the government also established that a cell phone that Ochoa purchased three days before the robbery had pinged cell towers in locations consistent with the robber's escape route as indicated by the GPS tracker in the bag of stolen cash.

The eye-witness identifications, circumstantial evidence discovered in Ochoa's bedroom, and the cell phone evidence, taken together, provided ample basis for a reasonable factfinder to "find that the evidence establishe[d] [Ochoa's] guilt beyond a reasonable doubt." See id.

## B. § 922(g) Felon In Possession Conviction

As to his conviction for knowingly possessing a firearm and ammunition as a convicted felon, Ochoa argues that the government failed to show that he possessed the firearm and ammunition that were discovered in the black gun case outside his residence.  "Possession of a firearm may be either actual or constructive."  United States v. Perez, 661 F.3d 568, 576 (11th Cir. 2011).  "Actual possession exists when a person has direct physical control over a thing." Henderson v. United States, 575 U.S. ___, ___,135 S. Ct. 1780, 1784 (2015); United States v. Derose, 74 F.3d 1177, 1185 (11th Cir. 1996) ("In order to find that

a defendant has actual possession, we must find that the defendant either had

physical possession or that he had actual personal dominion over the thing

allegedly possessed.").

Constructive possession, on the other hand, "exists when a person has

knowledge of the thing possessed coupled with the ability to maintain control over

it." Derose, 74 F.3d at 1185 (quotation marks omitted).  Mere presence near a

firearm is not enough to establish constructive possession.  Perez, 661 F.3d at 576.

In order to establish constructive possession, the government was required to

prove, through direct or circumstantial evidence, that the defendant was aware or

knew of the firearm's presence and had the ability and intent to later exercise

dominion and control over the firearm.  See id.; Derose, 74 F.3d at 1185 ("[A]

court may find constructive possession by finding ownership, dominion, or control

over the contraband itself or dominion or control over the premises . . . in which

the contraband was concealed.").

Section 922(g)(1) makes it "unlawful for any person . . . who has been

convicted in any court of[] a crime punishable by imprisonment for a term

exceeding one year . . . to . . . possess in or affecting commerce[] any firearm or

ammunition."  18 U.S.C. § 922(g)(1) (emphasis added).  The second indictment in

this case charged Ochoa with violating § 922(g)(1) by "knowingly possess[ing] a

firearm and ammunition in and affecting interstate and foreign commerce."

Ochoa argues that the government failed to prove that he possessed both the firearm and the ammunition.  However, it was necessary for the government to sufficiently establish that he possessed only either one to sustain his § 922(g)(1) conviction.  See United States v. Griffin, 705 F.2d 434, 436 (11th Cir. 1983) ("The law is well established . . . that where an indictment charges several means of violation of the statute in the conjunctive, proof of only one of the means is sufficient to convict.").  In fact, the district court instructed the jury that Ochoa could be found guilty if it was proved beyond a reasonable doubt that

(1)     [Ochoa] knowingly possessed a firearm or ammunition in or affecting interstate or foreign commerce; and

(2)     before possessing the firearm or ammunition, [Ochoa] had been convicted of a felony—a crime punishable by imprisonment for more than one year.

Thus, the jury could have convicted Ochoa based on its conclusion that he actually or constructively possessed the ammunition discovered in the bedroom drawer (the large capacity magazine and box of bullets), the gun and ammunition discovered in the black gun case outside the residence, or both.

As to the ammunition in the bedroom drawer, the jury was presented with sufficient evidence from which it reasonably could have concluded that Ochoa constructively possessed that ammunition.  The government tied Ochoa to the bedroom through his phones (one of which had on it a photo of Ochoa laying on the bed in the bedroom), personal identification cards, and travel papers bearing his

name—all of which were found in the same bedroom as the ammunition.  Ochoa's

driver's license, which agents discovered in a car parked on the front lawn, also

listed his address as the residence in question.  This evidence allowed the jury to

conclude Ochoa exercised dominion and control over that bedroom, which in turn

allowed the jury to infer he constructively possessed the items, including the

ammunition, found therein.  See United States v. Molina, 443 F.3d 824, 830 (11th

Cir. 2006) (concluding sufficient evidence supported a defendant's conviction for

possession of a firearm in furtherance of a drug trafficking crime and noting that

"[b]ecause the firearm was found in [the defendant's] bedroom, in the drawer of

the nightstand that also contained . . . her passport . . . a reasonable jury could have

found that [she] exerted ownership, dominion, or control over the firearm"

(quotation marks omitted)); Derose, 74 F.3d at 1185 ("[A] court may find

constructive possession by finding ownership, dominion, or control over the

contraband itself or dominion or control over the premises . . . in which the

contraband was concealed.").  The fact that other people had access to or may

have also occupied the residence does not make the above evidence insufficient.

As to the firearm and ammunition found in the black gun case outside the

residence, the government also presented the jury with sufficient circumstantial

evidence from which the jury reasonably could have determined Ochoa was aware

or knew of the firearm's presence and had the ability and intent to later exercise

dominion and control over the firearm.  See Henderson, 575 U.S. at ___, 135 S. Ct. at 1784; Derose, 74 F.3d at 1185.

Ochoa admitted to Agent Swinerton that there was a gun in a drawer in a bedroom in the residence, thus establishing his knowledge and awareness of the firearm's presence in the residence.  Admittedly, the black gun case containing the .45-caliber handgun and additional .45-caliber ammunition ultimately was discovered outside the house, not in the bedroom drawer.  But the agent who discovered the black gun case testified that the back door had been unlocked and that a stray .45-caliber Speer bullet found on the ground near the gun case did not appear as though it had been outside for any length of time.  Further, upon searching the residence, officers discovered accessories for the .45-caliber handgun in Ochoa's bedroom—including a holster and additional .45-caliber ammunition—but did not discover any other firearms inside or outside the residence.

Based on this, the jury could have drawn reasonable inferences and adopted the government's preferred construction of the evidence: that the black case containing the gun and ammunition had, at one point, been in Ochoa's bedroom, and it was moved outside by Ochoa's brother Angel so as to reduce the chance that officers would find the gun and ammunition, or be able to tie them to Ochoa. Having concluded the gun case (containing the firearm and ammunition) had, at one point, been in the bedroom, the jury then could reasonably have inferred that

Ochoa solely or jointly possessed the firearm because, as we discussed above, there was ample evidence from which the jury could have inferred that the bedroom was Ochoa's.  See Henderson, 575 U.S. at ___, 135 S. Ct. at 1784; Derose, 74 F.3d at 1185.

The government also presented testimony from an FBI analyst concerning DNA recovered from the firearm itself.  The evidence was, admittedly, inconclusive, but the analyst testified that he could not exclude Ochoa as a contributor to the sample of DNA taken from the firearm.  The jury also had before it Ochoa's two previous felony convictions involving possession of firearms, which were properly admitted under Rule 404(b), as evidence bearing on Ochoa's state of mind—that is, whether he knowingly possessed the firearm as a convicted felon.  Fed. R. Evid. 404(b).

In light of the totality of the evidence, we readily conclude that a reasonable factfinder could find that the evidence established, beyond a reasonable doubt, that Ochoa constructively possessed the ammunition recovered from the drawer and the firearm and ammunition found in the black gun case.  See Kelly, 888 F.2d at 740. Either possession was sufficient to sustain his § 922(g) conviction.

## X. CUMULATIVE ERROR

Ochoa's last argument concerning his three convictions is that cumulative error by the district court requires reversal.  However, Ochoa has not established a

single error, let alone the aggregation of "many errors" that may require a reversal where the individual errors do not.  See United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005), abrogated on other grounds by Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273 (2006).  Ochoa's cumulative error claim therefore lacks merit.

## XI. SENTENCING ISSUES

On appeal, Ochoa contends the district court procedurally erred in calculating his advisory guidelines sentences in both sentencing proceedings.  He challenges two specific rulings, which we address in turn.[19]

### A. Career Offender Under § 4B1.1(a)

As to his sentencing on Counts One and Two, Ochoa argues the district court improperly classified him as a career offender under U.S.S.G. § 4B1.1(a) because it erroneously concluded that his Florida convictions for armed robbery and second-degree murder categorically qualified as crimes of violence under U.S.S.G. § 4B1.2(a).[20]

---

[19]We review de novo the interpretation and application of the guidelines, and we review for clear error a district court's underlying factual findings.  United States v. Tejas, 868 F.3d 1242, 1244 (11th Cir. 2017).  "For a factual finding to be clearly erroneous, we must be left with a definite and firm conviction that the court made a mistake."  Id.

[20]As to the Florida armed robbery conviction, the PSR on Counts One and Two described the conviction as "armed robbery," while the PSR on Count Three described it as "attempted armed robbery."  As for the parties, Ochoa's briefs on appeal consistently refers to it as "armed robbery," while the government's brief refers to it simply as "robbery."  We need not reconcile any inconsistencies here, however, because, as discussed below, both substantive and attempted

64

Section 4B1.1(a) provides that "[a] defendant is a career offender if" the

following conditions are met:

> (1)  the defendant was at least eighteen years old at the time the
> defendant committed the instant offense of conviction;
>
> (2)  the instant offense of conviction is a felony that is either a crime
> of violence or a controlled substance offense; and
>
> (3)  the defendant has at least two prior felony convictions of either a
> crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a).  A defendant who qualifies as a career offender is assigned a

potentially higher offense level and a criminal history category of VI.  Id.

§ 4B1.1(b).

In turn, § 4B1.2(a) defines a "crime of violence" as any offense under

federal or state law, punishable by imprisonment for a term exceeding one year

that "has as an element the use, attempted use, or threatened use of physical force

against the person of another."  U.S.S.G. § 4B1.2(a)(1).  Because the elements

clause definition of "crime of violence" under § 4B1.2(a) in the Guidelines and the

elements clause definition of "violent felony" under the Armed Career Criminal

Act ("ACCA") are virtually identical, this Court looks to the Supreme Court's and

our own decisions applying the ACCA for guidance in considering whether an

---

robbery under Florida law qualify as "crime[s] of violence" under U.S.S.G. § 4B1.2(a)'s
elements clause.  In any event, because Ochoa's brief refers to only armed robbery,
not attempted armed robbery, he has abandoned any potential claim about the nature of his Florida
robbery conviction.

offense qualifies as a crime of violence under the Guidelines, and vice versa.

United States v. Fritts, 841 F.3d 937, 940 n.4 (11th Cir. 2016) (citing United States

v. Alexander, 609 F.3d 1250, 1253 (11th Cir. 2010)).

Both the Supreme Court and this Court have held that a defendant's Florida

robbery conviction qualified as a violent felony under the ACCA's elements

clause.  Stokeling v. United States, 586 U.S. ___, 139 S. Ct. 544, 554 (2019) (1997

Florida robbery conviction); Fritts, 841 F.3d at 939–44 (1989 Florida armed

robbery conviction).  Similarly, this Court has held that Florida attempted robbery

is a crime of violence under U.S.S.G. § 4B1.2(a)'s elements clause.  United States

v. Lockley, 632 F.3d 1238, 1240 n.1, 1245 (11th Cir. 2011) ("Lockley's [2001

Florida] attempted robbery conviction categorically qualifies under the elements

clause as a predicate for the career offender enhancement.").

More specifically, in Stokeling, the Supreme Court examined Florida law

and determined that under Florida law, the "use of force" necessary to commit

robbery is "force sufficient to overcome a victim's resistance."  Stokeling, 586

U.S. at ___, 139 S. Ct. at 548–49.  The Supreme Court then concluded that the

term "physical force" under the ACCA—that is, "force capable of causing physical

pain or injury"—encompasses offenses "that require the criminal to overcome the

victim's resistance."  Id. at ___, 139 S. Ct. at 555 (citation and quotation marks

omitted), 550.  Having concluded that "force capable of causing physical pain or

injury" under the ACCA includes force sufficient to overcome a victim's

resistance, the Supreme Court found that "the application of the categorical

approach to the Florida robbery statute is straightforward." Id. at ___, 139 S. Ct. at

555. "Because the term 'physical force' in [the] ACCA encompasses the degree of

force necessary to commit common-law robbery, and because Florida robbery

requires that same degree of 'force,' Florida robbery qualifies as an ACCA-

predicate offense under the elements clause."[21] Id.

And in United States v. Jones, 906 F.3d 1325, 1329 (11th Cir. 2018), cert.

denied, 586 U.S. ___, 139 S. Ct. 1202 (2019), this Court held that a conviction for

Florida second-degree murder, pursuant to Florida Statute § 782.04(2), is

categorically a violent felony under the ACCA's elements clause. 906 F.3d at

1329. In so holding, we relied on our prior decision in Hylor v. United States, 896

---

[21]This Court has discussed the Florida Supreme Court's decisions concerning this issue before. See Fritts, 841 F.3d at 943. In 1997, the Florida Supreme Court in Robinson v. State, 692 So. 2d 883 (Fla. 1997), pointed to its own 1976 decision in McCloud v. State, 335 So. 2d 257 (Fla. 1976), and stressed that robbery requires "more than the force necessary to remove the property" and in fact requires both "resistance by the victim" and "physical force [by the offender]" that overcomes that resistance, stating:

> In accord with our decision in McCloud, we find that in order for the snatching of property from another to amount to robbery, the perpetrator must employ more than the force necessary to remove the property from the person. Rather, there must be resistance by the victim that is overcome by the physical force of the offender.

Robinson, 692 So. 2d at 886. In Robinson, the Florida Supreme Court reaffirmed that "[t]he snatching or grabbing of property without such resistance by the victim amounts to theft rather than robbery." Id. at 887. The Robinson court further stated that "Florida courts have consistently recognized that in snatching situations, the element of force as defined herein distinguishes the offenses of theft and robbery." Id. In other words, Robinson reaffirmed that merely snatching property—without resistance by the victim and use of physical force to overcome the victim's resistance—did not constitute a robbery under Florida law.

F.3d 1219 (11th Cir. 2018), ruling that Florida attempted first-degree murder was a violent felony under the ACCA's elements clause.  Jones, 906 F.3d at 1329.  In Jones, this Court noted that "[t]he only meaningful difference between first- and second-degree murder in Florida is that first-degree murder requires the element of premeditation, while second-degree murder does not."  Id.  We concluded that "[t]he mens rea distinction between first- and second-degree murder makes no difference to our determination under the ACCA elements clause."  Id.

Accordingly, based on the above precedent, we conclude that Ochoa's Florida convictions for armed robbery and second-degree murder qualify as crimes of violence under U.S.S.G. § 4B1.2(a).  See Alexander, 609 F.3d at 1253.  Thus, the district court properly determined that Ochoa was a career offender under § 4B1.1(a) for purposes of his sentencing on Counts One and Two.[22]

---

[22] Ochoa acknowledges that we should review for plain error his objection to his career-offender designation in his sentencing on Counts One and Two, as he failed to object to that designation on the grounds now asserted.  See United States v. Camacho–Ibarquen, 410 F.3d 1307, 1315 (11th Cir. 2005).  However, as shown above, we have reviewed de novo his career-offender objection because his prior convictions also impact his base offense level on Count Three, and Ochoa preserved his objection as to his prior convictions as to that count.  In short, because Ochoa's objections to the two sentences come down to the same issue—i.e., whether Ochoa's Florida convictions for robbery and second-degree murder qualify as crimes of violence under § 4B1.2(a)—we apply the less-deferential standard of review and consider Ochoa's arguments de novo.  United States v. Gibson, 434 F.3d 1234, 1243 (11th Cir. 2006).

**B. Firearm and Large Capacity Magazine Under § 2K2.1(a)**

As to his sentencing on Count Three, Ochoa challenges the district court's application of the higher base offense level of 26 to his felon-in-possession conviction under 18 U.S.C. § 922(g).  The base offense level for violations of § 922(g) is 26, if these two requirements are met:

>  (A) the offense involved a . . . semiautomatic firearm that is capable of accepting a large capacity magazine . . . and

>  (B) the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 2K2.l(a)(l).  The subsection (B) requirement is met because Ochoa's two Florida convictions—armed robbery and second-degree murder—qualify as crimes of violence.  For the reasons discussed above, we reject Ochoa's arguments that subsection (B) is not satisfied.

As to the subsection (A) requirement, application note 2 to § 2K2.1 defines "a semiautomatic firearm that is capable of accepting a large capacity magazine" as one:

>  that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

Id., cmt. (n.2).  There is no dispute that there was no magazine physically attached to the firearm found in the black gun case.  Nor is there any dispute that the

magazine recovered from the bedroom drawer was one that "could accept more than 15 rounds of ammunition."

The only question for us to decide, then, is whether the large capacity magazine found in the bedroom drawer was in "close proximity" to the firearm. Ochoa argues that the firearm found in the black gun case (the .45-caliber Heckler & Koch handgun) was found outside of the residence, and, therefore, it was not "in close proximity to" the large capacity magazine in his bedroom drawer.

We recently addressed the issue of "close proximity" under application note 2 to § 2K1.2 in United States v. Gordillo, 920 F.3d 1292 (11th Cir. 2019). The defendant in Gordillo similarly challenged the application of a higher base offense level based on the district court's finding that his offense involved a "semiautomatic firearm that is capable of accepting a large capacity magazine." Gordillo, 920 F.3d at 1295–96 (quoting U.S.S.G. § 2K2.1(a)(4)(B)(i)). There, as here, the district court based that ruling on its finding that the firearm was found "in close proximity" to a large capacity magazine. Id. at 1296. The large capacity magazine in Gordillo was found in a range bag "about 10 feet away" from a locked gun case containing the subject firearm. Id.

In Gordillo, this Court discussed the meaning of "close proximity" at length, reviewed our decisions involving guns "in connection with" drugs, and concluded that "'close proximity' encompasses both physical distance and accessibility." Id.

at 1297–1300.  We added that, "[i]n both contexts"—that is, in considering a gun's proximity to both drugs and large capacity magazines—"we are looking for a close connection between the items." Id. at 1300.  This Court determined that, under a definition of "close proximity" that accounts for both physical distance and accessibility, "a semiautomatic weapon—even a locked firearm inside a case—is in 'close proximity' to a [large] capacity magazine in a bag no more than ten feet away in the same small bedroom." Id.  This was because the gun and magazine "were both physically proximate and readily accessible." Id.

Applying these principles here, it is apparent that the increased base offense level of 26 properly applies if we defer to the district court's explicit conclusion that Ochoa's brother, Angel, "went into the house [and] took out the firearm, the other magazines fully loaded with [.45-caliber] ammunition."  Crediting this factual determination—which places the gun, at the very least, in the same room, if not the same drawer, as the large capacity magazine—it is easy to conclude that the gun and magazine "were both physically proximate and readily accessible" at the time of the offense, regardless of their respective locations upon their discovery by law enforcement.  See id.

As outlined above, in the light most favorable to the government, the district court had ample evidence before it to support this factual finding.  Ochoa himself told Agent Swinerton that there was a firearm inside the residence inside a drawer

71

in one of the bedrooms.  The authorities recovered no other handgun upon searching the entire premises.  And the ammunition and other accessories found in Ochoa's bedroom drawer—a holster, a large capacity magazine containing .45-caliber ammunition, and a box containing four additional rounds of .45-caliber ammunition—all were compatible with the .45-caliber pistol found in the black gun case in the yard.

As such, Ochoa has failed to show that the district court clearly erred in finding that it was more likely than not that the .45-caliber firearm that was the subject of his § 922(g) offense was recently removed from Ochoa's bedroom and moved outside by Ochoa's brother.  See Tejas, 868 F.3d at 1244.  In light of this finding, the district court correctly concluded that the Count Three offense involved a semiautomatic .45-caliber firearm that was in close proximity to a large capacity magazine that was capable of holding more than 15 rounds of .45-caliber ammunition.  U.S.S.G. § 2K2.1(a)(1) & cmt. (n.2).

## XII. CONCLUSION

For the reasons stated above, we affirm Ochoa's convictions and sentences.

**AFFIRMED.**

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

I concur in much of the thorough opinion of the Majority, but I write separately to briefly address two issues. First, I would affirm the district court's granting of the government's motion *in limine* to restrict the cross-examination of Officer Starkey, on more limited grounds than does the Majority Opinion. And second, with respect to the denial of the suppression motion on the public-safety exception, I would find reversible error, vacate the conviction on Count Three, and remand for a new trial on that count only.

## I.

First, I address the government's motion *in limine* to circumscribe the cross-examination of Officer Starkey. I agree that, on this record, we cannot say the district court abused its discretion when it limited the cross-examination. But though I would rely on much of the Majority Opinion's reasoning in this regard, I do not share the view that Officer Starkey's prior misconduct, in which he originally falsely denied wrongdoing and later separately admitted to basically an effort to obstruct an investigation into his own conduct, does not bear on the likelihood he may have "falsif[ied] or manipulate[d] evidence in an ongoing criminal investigation of another person." Maj. Op. at 39-40.

I think it could. If Officer Starkey had attempted to manipulate a witness—

73

and to be clear, here, there is no evidence of that—that would have constituted misconduct. And he would have faced the same temptation to cover that up and lie about it as he did in the incidents leading to the earlier findings of misconduct against him.

Nevertheless, here, independent sources were present for the events to which Officer Starkey testified. Examination of them into Officer Starkey's conduct was not limited, and they corroborated Officer Starkey's testimony. So Ochoa had several other ways to uncover any misconduct or lies by Officer Starkey in this particular case.

First, Officer Starkey's interview of Ochoa was recorded (and another officer was also present) and significant portions of it were played for the jury. Plus, Ochoa could have played more, had he desired to do so. The jury's ability to view the recording of Officer Starkey's interview of Ochoa allowed the jury to evaluate for itself, essentially firsthand, whether Officer Starkey lied or otherwise engaged in misconduct during the interview.

Second, other officers were present during the search when Officer Starkey found the money in the freezer. Ochoa could have called these other officers and cross-examined them, as well as Officer Starkey, about the discovery to see whether their recollections all matched up. Likewise, the very recovery of the $12,900 in

$100 bills also substantiated Officer Starkey's testimony that he found the money at Ochoa's residence.

And third, Montenegro and Bermudez, who each separately identified Ochoa from a photo lineup Officer Starkey presented, both attested to the procedure Officer Starkey used to present the photo lineups to them and obtain their identification of Ochoa. Notably, neither witness shared Officer Starkey's interest in protecting him from consequences of wrongdoing, had Officer Starkey engaged in any such misconduct while presenting the photo lineup to each witness. And as the Majority Opinion notes, both Montenegro and Bermudez were subjected to rigorous cross-examination and could have revealed any misconduct by Officer Starkey in conducting the photo-lineup identifications, had any occurred. In light of the availability of numerous other sources to allow Ochoa to uncover any misconduct or untruthfulness by Officer Starkey here, the value of cross-examining Officer Starkey on his prior misconduct was relatively marginal in this case. And I cannot conclude that the district court abused its discretion in precluding Ochoa from inquiring into Officer Starkey's prior misconduct.[1]

---

[1] If the other witnesses had in fact provided testimony that implicated Officer Starkey in some relevant wrongdoing, then a motion for reconsideration might have some teeth. But those facts are simply not present here.

Plus, even assuming the district court did abuse its discretion in limiting Officer Starkey's cross-examination, for those same reasons, any error was harmless.

## II.

Turning to the denial of Ochoa's motion to suppress his statement about the gun in the drawer of the bedroom, I would reverse that ruling, vacate the conviction on Count III, and remand for a new trial on that count only. In particular, I am concerned that today's Majority Opinion carries the public-safety exception further than the reasons justifying its existence support. In so doing, the Majority Opinion's interpretation undermines Fifth Amendment protections.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has construed this protection to apply to those subjected to custodial interrogation by the police. *See Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966). To safeguard the Fifth Amendment right to avoid compelled self-incrimination, the Supreme Court established, as a general rule, that statements made in certain custodial circumstances, such as those present here, are inadmissible unless the suspect is "specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984).

But for every rule an exception exists.  And that is the case with *Miranda* rights as well.  In *Quarles*, as the Majority Opinion indicates, the Supreme Court recognized an exception to the *Miranda* rule for public safety.  *See* Maj. Op. at 44-45.  There, the Court held that when law-enforcement officers ask questions of a person in custody, that are "reasonably prompted by a concern for the public safety," *id.* at 656, the answers to those questions are admissible against the speaker, even though the speaker has not received his *Miranda* warnings, *id.* at 655-56.

In *Quarles*, a woman told officers she had been raped by a man who had a gun and had just entered a particular market.  *Id.* at 651-52.  At the market, after a brief chase, the officers apprehended the defendant because he fit the description the woman provided.  *Id.* at 652.  But when an officer frisked the defendant, he found only an empty shoulder holster.  *Id.*  So before reading the defendant his *Miranda* rights, he asked the defendant where the gun was.  *Id.*  When the defendant pointed and said, "the gun is over there," the officer retrieved the weapon.  *Id.*  The trial court suppressed the statement and the weapon for failure to comply with *Miranda*.  *Id.* at 652-53.

The Supreme Court concluded that was error, based on the public-safety exception to *Miranda*.  *Id.* at 657-58.  In reaching this conclusion, the Court reasoned that the officers urgently needed to find the gun because they had "every reason to believe" it had been discarded in the busy supermarket and might fall into the hands

of an accomplice, an employee, or a customer and present a real risk to those present.

*Id.* at 657.  And we do not want officers faced with the urgency of such situations to make decisions based on what is best for proving the case instead of what is best for public and their own safety.  *Id.* at 655-56.  Therefore, the Court explained, "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination."  *Id.* at 657.

In *United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007), we applied the public-safety exception in a case that the Majority Opinion has described as "similar to this one."  Maj. Op. at 45.  There, the defendant was taken into custody while in a motel room.  *Newsome*, 475 F.3d at 1223.  While on the ground and before he was read his *Miranda* rights, an officer asked him if there was "anything or anyone in the room that [he] should know about."  *Id.*  The defendant advised the officer that he had a gun "over there," and motioned with his head towards a nightstand.  *Id.*  When the officer did not see the gun, he asked the defendant where it was, and the defendant pointed the officer to a black bag containing the weapon.  *Id.*  The defendant sought to suppress his statements and the gun.  *Id.*

We concluded that under the public-safety exception, the statements and gun were admissible.  *Id.* at 1224-25.  We noted that at the time of entry, the officers were under the impression that another person was also in the room, so officers could

have reasonably been concerned that the other person could be hiding in the room, ready to ambush them. *Id.* at 1225. Therefore, we explained, the officers acted appropriately to protect themselves and other motel guests. *Id.* Plus, since the defendant was still in the room where the gun was and they did not know where in the room the gun was located, they reasonably could have been concerned that the gun may have remained within reach of the defendant, if he broke the officers' hold on him.

And the reason motivating the Supreme Court's decision in *Quarles* provides an additional basis for upholding *Newsome*'s application of the public-safety exception. As in the public market space in *Quarles*, the motel room in *Newsome* would be entered later by members of the public: motel employees and other guests. If a gun was present, it was important for public safety that the officers remove it before any members of the public encountered it.

In two important ways, Ochoa's case is not like *Quarles* or *Newsome*.

First, here, the officers were searching a private house. So unlike in *Quarles* or *Newsome*, no members of the public were at risk of entering and unsuspectingly stumbling upon a firearm. Therefore, that justification does not apply here.

The Majority Opinion attempts to blur this distinction from *Newsome* by asserting that "*Newsome* still involved a small, private space that, at the time, was occupied by the defendant and was not open to the public." Maj. Op. at 47 n.15.

Most respectfully, that argument misses the mark.  In *Newsome*, no members of the public were at risk of finding the gun while the officers were present in the motel room and arresting the defendant.  Instead, the public-safety risk stemmed from the possibility that members of the public may have discovered the weapon after the police left the premises.  The person finding the gun could have been an unsuspecting member of the motel staff or the next guest to occupy that room—possibly even a child guest.  For that reason, the public-safety exception, as explained in *Quarles*, indisputably applied to the situation in *Newsome*.  But that situation is not a plausible possibility in a private home.

The case here also differs from *Newsome* in another important way.  Unlike in *Newsome*, where the officer asked generally about "anything or anyone in the room that [he] should know about," here, the officer asked whether there were any "[b]ombs, booby traps, **weapons**," or anything else that could be "harmful" (emphasis added).  Of course, the officers should be able to protect themselves before entering the premises by asking about anything that could, by itself—without the assistance of a person—be "harmful" to them.  For that reason, the public-safety exception allows officers, in addition to inquiring generally about things that may be "harmful" to them to ask even specifically about things like "[b]ombs [and] booby traps."  After all, learning of the existence of these items would likely alter an officer's conduct in entering the premises.  For example, she might call in a bomb

squad to deal with a bomb.  Or if she is aware of booby traps and what triggers them, she will avoid engaging in any triggering action when she enters the place to be searched.  The precise formulation of a question about things that might, in fact, be harmful to an officer also does not matter.  *Newsome*, 475 F.3d at 1225.

But asking specifically about weapons that cannot fire themselves or otherwise harm officers without someone operating them is different.  The Majority Opinion reasons that the officers could ask about weapons because "other individuals might have remained in the residence" and could have had access to any weapons.  *See* Maj. Op. at 47.  That is a valid concern.  But it is one that naturally falls into the category of potential hazards that could independently harm officers entering the premise.  As Agent Swinerton freely conceded, asking about weapons does nothing to allay the danger of unknown individuals remaining within the residence.

First, Agent Swinerton explained that the concern arises from the presence of other people on the premises who might use the firearms, not the presence of the weapons themselves.  He acknowledged that "if there was a gun in [the house] but nobody in [the house], [that] would [not] pose a risk to [his] team."  That is so because "[g]uns can't fire on their own."  Rather, Agent Swinerton continued, "we need individuals to go with [the guns for the guns to be dangerous to officers], [so] we need to determine if there's somebody else in the home."  Indeed, even if a

suspect knows of no weapons in the home, other people still in the home could be carrying their own weapons, creating a threat to entering officers.

What actually occurred here demonstrates those principles. Though Ochoa told the officers that a gun was in the house, they did nothing directed at the gun when they conducted their initial safety sweep of the house. Instead, they looked for only *people* who could present a risk to them. So the question that could shed light on any danger non-self-operating weapons could present to officers is whether any other people are present in the home—not whether weapons are present.

Second, even if an officer asks whether the home has any weapons in it, no officer entering an unknown home after arresting a "potentially violent suspect," Maj. Op. at 47, would cast all caution aside just because the suspect said no weapons were present. That is so because, as Officer Swinerton explained, law enforcement "find[s] additional bodies in homes all the time, even after [law enforcement is] told repeatedly and insistently that there's nobody else in the house." In short, officers proceed with the same caution in the absence of knowledge of a gun that they do if they know of a firearm's presence in the home.

The Majority Opinion suggests that is not the case, quoting Agent Swinerton as having testified that "if agents were to discover 'additional individuals' upon entering the home, 'and [the agents] know there[] [are] weapons in the house, it[] [is] going to change, potentially, what [they] do.'" Maj. Op. at 47. But the Majority

Opinion misunderstands Agent Swinerton's testimony.  As I have noted, Agent Swinerton expressly explained that what alters the officers' behavior is not the mere existence of guns inside an empty property; it is rather the presence of people who might have guns that can affect the officers' entry plan.  And since unknown people in the home can have guns on their persons whether or not the arrestee has any weapons on the premises, officers must proceed with equal caution, regardless of whether a defendant advises them that the house contains a firearm.

If learning that a gun is present in what is believed to be an empty home would not alter the officers' conduct from what it would be if they did not know whether a gun was present, the public-safety exception cannot justify asking a suspect about the presence of weapons.  That is so because the question does not assist in "secur[ing] the [officers'] safety or the safety of the public."  *Quarles*, 467 U.S. at 659.  As a result, the "exigency which justifies" the public-safety exception to *Miranda* "circumscribe[s]" to the point of preclusion the officers' ability to ask specifically about weapons.  *Id.* at 658-59.

It makes no difference whether the officer asks about only weapons specifically or instead adds the term to a laundry list of items she may permissibly inquire about, such as bombs, booby traps, or anything else that might be harmful to the entering officers.  An officer may not cleanse an impermissible pre-*Miranda*

question by burying it in a heap of permissible ones.  If she could, *Miranda*'s holding would become illusory.

Indeed, because a question about the presence of weapons assists in "secur[ing] the [officers'] safety" in entering an unknown home, *Quarles*, 476 U.S. at 659, no more than a question about the presence of cocaine, it can be justified by the public-safety exception no more than can a question about the presence of cocaine.  Yet such a question can goad a suspect in custody who has not yet been advised of his *Miranda* rights to fully incriminate himself as a felon in possession of a firearm, as occurred here.  And asking a suspect who is clearly in custody incriminating questions before advising him of his *Miranda* rights, in the absence of a public-safety reason for doing so, violates *Miranda*.  So I would find that the district court erred in concluding that admission of Ochoa's answer to the officer's question as it regarded weapons—and only as it regarded weapons—violated Ochoa's Fifth Amendment right.

Because I would find error, I must consider whether the error here was harmless under *Chapman v. California*, 386 U.S. 18 (1967).  *United States v. Alexander*, 835 F.2d 1406, 1411 (11th Cir. 1988).  Under the *Chapman* standard, an error is not harmless if we cannot say beyond a reasonable doubt that the error "did not contribute to the [defendant's] conviction[]."  386 U.S. at 26.

Here, the issue is close.  On the one hand, the evidence supporting Ochoa's conviction for possession of the ammunition that was found in the bedroom drawer and charged in the indictment was substantial.  Ochoa's Florida driver's license bore the address of the residence where the bedroom was located.  And that license, in turn, was found in a car parked at that same address.  As for evidence tying Ochoa to the specific room where the ammunition was located, while the government did not offer evidence to definitively prove that the room was Ochoa's, officers found within that room Ochoa's phone (with a picture of Ochoa laying on the bed in that bedroom), personal identification cards, and travel papers bearing his name.  This evidence, in and of itself, supports the conclusion that Ochoa had dominion and control over the room.  *See United States v. Molina*, 443 F.3d 824, 830 (11th Cir. 2006).

But on the other hand, all of the remaining evidence is circumstantial.  And the first time Count Three was tried, the jury could not reach a verdict—even when it had the direct evidence of Ochoa's admission about the gun.  Subtracting the only direct evidence is significant, and I cannot conclude beyond a reasonable doubt that it would not affect the outcome on Count Three here.  For that reason, I would vacate the conviction on Count Three and remand for a new trial on that count.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 25, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  16-17609-EE  ; 18-10142 -EE
Case Style:  USA v. Daniel Ochoa
District Court Docket No:  1:14-cr-20674-JLK-1

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Elora Jackson, EE at (404) 335-6173.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion